# EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ANTHONY CASTEL NAVARRO, individually,

Plaintiff,

vs.

CITY AND COUNTY OF SAN FRANCISCO; OFFICER JEFFREY LUBEY, in his individual capacity as a law enforcement officer for the SAN FRANCISCO POLICE DEPARTMENT; and DOES 1-50, inclusive,

Defendants.

Case No.: 3:23-cv-02402-SK

VIDEOCONFERENCE DEPOSITION OF

RACHYLL DEMPSEY, PSY.D.

Pacifica, California

Friday, September 6, 2024

Reported by: Andrea F. Dance
CSR No. 12865
Job No.: 306202

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY CASTEL NAVARRO, individually,<br><br>Plaintiff,<br><br>vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO; OFFICER JEFFREY LUBEY, in his individual capacity as a law enforcement officer for the SAN FRANCISCO POLICE DEPARTMENT; and DOES 1-50, inclusive,<br><br>Defendants. | Case No.: 3:23-cv-02402-SK |

VIDEOCONFERENCE DEPOSITION OF RACHYLL DEMPSEY, PSY.D., taken on behalf of Plaintiff, at Pacifica, California, beginning at 1:27 p.m. and ending at 2:47 p.m., on Friday, September 6, 2024, before Andrea F. Dance, Certified Shorthand Reporter, No. 12865.

APPEARANCES (VIA REMOTE):

FOR PLAINTIFF:

POINTER & BUELNA, LLP
BY: PATRICK M. BUELNA, ESQ.
155 Filbert Street
Suite 208
Oakland, California 94607
(510)929-5400
pbuelna@lawyersftp.com

FOR DEFENDANTS:

SAN FRANCISCO CITY ATTORNEY'S OFFICE
BY: LUCIA Q LI, ESQ.
1390 Market Street
Sixth Floor
San Francisco, California 94102
(415)554-4206
lucia.li@sfcityatty.org

INDEX


| WITNESS | PAGE |
|---|---|
| Rachyll Dempsey, PSY.D. | 5 |
| Examination by Mr. Buelna | 5, 41, 54 |
| Examination by Ms. Li | 36, 50 |


EXHIBITS


| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Report; 2 pages | 6 |
| Exhibit 2 | Psychological Assessment | 13 |


(Exhibits to be provided by Mr. Buelna)

INFORMATION TO BE PROVIDED:

(None)

QUESTIONS INSTRUCTED NOT TO ANSWER:

(None)

PACIFICA, CALIFORNIA

FRIDAY, SEPTEMBER 6, 2024, 1:27 P.M.

RACHYLL DEMPSEY, PSY.D.,

having first been duly sworn by the reporter

was examined and testified as follows:

EXAMINATION

BY MR. BUELNA:

Q Good afternoon, Doctor. My name is Pat Buelna and I represent the plaintiff in a matter in which, it's my understanding, you produced a rebuttal report.

Is it your understanding that you're here to testify as to that report?

A Yes?

Q Have you ever -- do you know what a Rule 26 Report is?

A A Rule 26 Report?

Q Well, let me ask you this. Have you ever testified at a civil deposition before?

A Yes.

Q Do you know one way or another if those were typically state court cases?

A Several of them were. I have a testimony log that I can produce if need be.

Q It may be in here. Sometimes I glance at it, sometimes I don't. I'm sure it's in here.

I'll show you what I have for you. I have your appearances, research, publications. I did see that you taught at St. Mary's for a while. That's an incredible school. The graduates from there I've heard are stupendous people. Being a Gael myself, I have to say they are the best.

I don't see your prior list of testimony. Could you send that to your attorney or to myself? You can even drop it in the chat, maybe I missed it, but I don't think so. I'll show you what I'm looking at.

This is a copy of what I got. It will be Exhibit 1.

(Exhibit 1 was read into the record.)

BY MR. BUELNA:

Q So --

A That's a report.

Q -- yeah, so this is the report. I have a report that's about three pages, and then I have the CV with all of your prior experience on it, then a Works and Accomplishments, Publications, Research Experience, Guest Experiences, Professional Presentations, Education, Additional Education, Professional Affiliations, References, and Fee Schedule.

I don't have the list of testimony though.

A Okay.

Q How many times have you testified in civil depositions, to your recollection?

A I would have to go back and look.

Q Well, if you could send that to your attorney on a break, not a big deal, then I can ask those questions later.

A Okay.

Q But fair to say that you have testified at depositions before?

A Yes.

Q Is it okay if I don't go through the admonitions?

A Yes.

Q Have you ever prepared a rebuttal report before?

A Yes.

Q Okay. And have you ever testified in federal court before?

A I would have to check.

Q Okay. Is it your understanding that all the opinions, sitting here today, all the opinions that you intend to present at trial are contained within the four conners of this report?

A I don't know.

Q Do you have an understanding that you're supposed to, the opinions that you do intend to present at trial are supposed to be contained in this report?

A I, uh, I will testify as to what Ms. Li suggests I need to.

Q So let me put it this way: What was your assignment provided to you by counsel?

A So the first assignment was to review Dr. Jones' report and issue feedback, which I did in this rebuttal report.

The next was to evaluate Mr. Navarro, which I did, and then issue a report.

So to say that the only things that I would testify to would be in the rebuttal report, I'm not certain if that's true because I also evaluated Mr. Navarro.

Q I did not --

Lucia, did you disclose the evaluation?

MS. LI: Yes.

MR. BUELNA: As part of the rebuttal report or separately?

MS. LI: Separately.

MR. BUELNA: Okay. Let me go -- hold on. Was it in the pre -- is it part of the depo, or responses to

RPDs?

MS. LI: Yes.

MR. BUELNA: Okay. Hold on. Let me pull that up then.

BY MR. BUELNA:

Q In forming your rebuttal opinions, did you use your assessment?

A No, I had not assessed him before I sent the rebuttal. I issued the rebuttal report on July 2nd, I evaluated him on July 24th, and I issued an independent medical evaluation report on August 18th.

Q August 18th?

A I'm sorry, August 14th. So 8-14 is the date of the report. My mother's birthday 8-18.

Q So you issued a report on August 14th; is that right?

A Yes, sir.

Q Okay. Did the assessment change your recommendation or opinions in your rebuttal report?

A In some respects.

Q In what respect?

A Well, my recommendation would be that he undergo a full assessment by a licensed psychologist. So that opinion would have changed because I was the licensed psychologist to complete a full evaluation.

Q Anything else?
A With regard to recommendations, no. I actually didn't issue any specific recommendations in any report.
Q I'm trying to figure out here how to deal with this.
Did you conclude one way or another whether or not -- well, I guess did your assessment -- strike that.
Do you have an understanding that Dr. Jones had an opinion that the incident with the police triggered or re-triggered or worsened Mr. Navarro's PTSD?
A That's my understanding of what her opinion was, yes.
Q Okay. Did your assessment lead you to conclude a different opinion?
A No.
Q Did your assessment essentially confirm or corroborate that opinion?
A It's a little bit more nuanced than that.
Q Sure, why don't you explain to me.
A Well, in Dr. Jones' report, it appeared that she had completed her testing specifically with what doctors consider more of a confirmation bias, in that her tests that she chose were all surrounding the

Q Okay, that's a good way to put it.

How do you quantify that? Is there a test that you do?

A No, it's really just breaking down all of the things that I just named to Ms. Li, and, you know, taking into consideration the many other preexisting things, incidents and symptoms and treatment versus what happened after the incident.

Q So is there some training, like how do you quantify that? How do you come up with the number 90?

A Well, if we look at the number of different things that happened prior, including childhood experiences, and quantifiably if we look at the ACEQ questionnaire, and his high score on that suggests that he had a number of adverse childhood experiences.

And what we know is that research has shown that people with higher than four, four adverse childhood experiences, actually have a higher correlation with medical issues including hypertension, mental health issues including anxiety and depression, as well as learning impairments, you know, a number of different issues, problems with relationships.

So we look at that first, and then compounding on top of that the stuff happening before he turned 18, compounding on top of that the years that he spent under

paramilitary regiment in the Philippines, so he had a lot of trauma prior to this incident. And so quantifiable, if we were to look at the ACEQ questionnaire being so high, plus the additional traumas as an adult, that would be lead to a 90 percent.

Q Okay. But if he were to say, you know what, Doctor, I don't believe that. I think it's more like 85/15. Would you say, no, there's no way, it's 90. It's 90/10. Is that how strongly you feel about that number 90 or is it more of an approximation?

A I would feel fairly strongly about that 90 percent.

Q What if he said it's 95/5, would you say, no, it's 90 percent?

MS. LI: Objection. Argumentative.

You can answer.

THE WITNESS: I would still probably say the 90 percent, yes.

BY MR. BUELNA:

Q Okay. That's interesting. Is there any sort of scale that you do, like a map or a formula, to get to the 90/10?

A Yes and no. In the QME world we have, you know, different guidelines, and so I did not use those guidelines because that would not necessarily be

appropriate here, but that is something that I take into consideration, that, you know, has informed my clinical opinion over the years to help to quantify things and support opinions.

Q Now, going back to this thing where he changes environments. Now we talked about his move from San Diego with him mom, right?

A Yes.

Q Then he also moved to the Philippines, right?

A Yes.

Q And he did that to attend college in order to become an educator, right?

A Yes.

Q And part of the reason he said was to give back to the community and society, right?

A Yes.

Q In fact he got a bachelor's degree in ethnic studies, a master's degree in education, and a teaching credential, right?

A Yes.

Q His move to the Philippines, did you attribute that to avoidance?

A No.

Q Okay. So actually now it's more of something that he did, after going through everything he went

through, he still wanted to give back to people it seemed like, right?

A Yes.

Q Then when he left the Philippines, it sounds like it was in the dead of night to preserve his own life, right?

MS. LI: Objection. Argumentative. Speculation. Misstates the testimony.

You can answer.

THE WITNESS: Based on what he said, yes. I don't know about the dead of night, but he definitely said he had to, quote, flee the country because of fear for his life.

BY MR. BUELNA:

Q Because other teachers he reported had been killed?

MS. LI: Objection. Calls for speculation.

THE WITNESS: That's right. That's what he said.

BY MR. BUELNA:

Q So that one you don't attribute either to sort of avoidance, right? That's more of a "save my life" move, right?

A Yes. That's what he had reported, yes.

Q Okay. So the only real move that may have

been triggered or caused by PTSD symptoms that you described, was the move from San Francisco to Vietnam, right?

A No. It seemed like he and his mother fled San Diego to get away from his father and the incredibly dangerous situation and environment there to come up to San Francisco. And he seemed to have this tendency to flee, to leave situations that he deemed dangerous whether they were or they were not.

Q Dangerous enough for his mom to leave, right?

MS. LI: Objection. Calls for speculation. Harassing. Lacks foundation.

You can answer.

THE WITNESS: I actually did not have a chance to interview his mother, so I don't really know what her circumstances would have been reported.

BY MR. BUELNA:

Q But Mr. Navarro reported that his father was physically and emotionally abusive, right?

A Yes.

Q So he was fleeing, essentially, physical violence from his father, right?

MS. LI: Objection. Calls for speculation. Lacks foundation.

You can answer.

THE WITNESS: I'm not certain if it was specifically from his father, from the environment. He described a fairly dangerous neighborhood that he grew up in, so it could be any number of factors.

BY MR. BUELNA:

Q So it could of been all of those reasons. To get away from his father as well as a dangerous neighborhood, right?

MS. LI: Calls for speculation.

You can answer.

THE WITNESS: It's possible.

BY MR. BUELNA:

Q Okay. And he was only 18 at the time, right?

A Yes.

Q So if his mother moved from San Diego and he stayed there, his basic option may have been just he would have to live with his father, right?

MS. LI: Objection. Calls for speculation. Lacks foundation.

You can answer.

THE WITNESS: Actually, no. He actually had other relatives down there, so he could have stayed there and stayed with other relatives. He also reported having several friends.

BY MR. BUELNA:

Q Do you know if the relatives and friends offered him a place to stay when he moved from San Diego?

A No.

Q Okay. So how do you know he could have lived with the relatives or the friends?

A I don't know if he could have lived with them, but I know that he did say he had a number of relatives and friends down there. So it wasn't just a matter of he had to move here because of his mother or because he had to flee the circumstances, you know. There's a number of reasons that he could have stayed, and it seems like he was avoiding, just continuing the avoidance behavior.

Q Well, if he's 18, what other avoidance behavior did he show prior to 18?

A I didn't get into that with him.

Q So how could it be a repeating avoidance behavior at 18 then?

A Well, it would have been following his mother, and if his mother is engaging in avoidance behavior, then that's a behavior he's learning.

Q Do you know one way or another why his mother fled?

A No.
Q Okay. So how do you know she was avoiding?
A I would have to ask him. I want to say it was because -- I vaguely recall him saying that his mother was getting out of the situation directly after leaving his father.
Q Okay. And Mr. Navarro described watching severe domestic violence, meaning his father beating his mother, right?
A That's right.
Q And so, you know, she may have been and likely was fleeing physical assaults.
Right?
MS. LI: Objection. Calls for speculation. Asked and answered. Harassing.
You can answer.
THE WITNESS: It's possible.
BY MR. BUELNA:
Q And he chose to go with his mom?
A Yes.
Q Okay. All right.
I have no further questions.
FURTHER EXAMINATION
BY MS. LI:
Q Just a few.

Dr. Dempsey, Mr. Navarro explained to you that he grew up in a working class community that had gangs and violence around his neighborhood, correct?

A Yes.

Q Mr. Navarro admitted to fighting throughout his childhood, correct?

A Yes.

Q Mr. Navarro admitted to seeing one of his close friends getting, quote, "beat with a lead pipe" end quote, so badly that he was in a coma, correct?

A Yes.

Q He also informed you of a story of another friend being stabbed and killed, correct?

A Yes.

Q And it was his report that all these incidents happened as he was a minor, correct?

A Yeah.

Q And he also reported to you that he completed high school but was never inspired by the educational system until he relocated to San Francisco Bay Area and started college, correct?

A Yes.

Q And so when Mr. Buelna indicated that Mr. Navarro moved to the Philippines for college, that is not the full picture as to when Mr. Navarro started

college, correct?
A That's right.
Q Mr. Navarro had family in the Philippines and was inspired to return to the Philippines after starting college, correct?
A Yes.
Q So would this additional incident of being exposed to violence as a minor in the neighborhood and witnessing at least the two violent incidents of close friends being severely injured or killed, be considered traumatic experiences?
A Yes.
Q Would that be a qualifying event for a post-traumatic stress disorder?
A It could be, yes.
Q And the apportionment methodology that you used to come to the conclusion that Mr. Navarro's PTSD symptoms were 90 percent attributed to pre-incident or non-incident factors, is this a methodology that is widespread and accepted within the psychiatric community?
A Yes.
Q And your opinion on this matter, are you confident within a reasonable scientific -- strike that.
The apportionment opinion that you gave of

90 percent non-incident related symptoms, is that an opinion that you can give that is reasonably scientifically reliable?

A Yes.

Q Now, this methodology that you used, does it rely upon peer reviewed articles and publications?

A No, it's a structured professional judgment that is based on the culmination of the different incidents and identifying early childhood experiences, adult experiences, previous diagnoses, previous treatment, in addition to other things that actually don't apply in Mr. Navarro's case, including like, you know, severe substance use or suicide attempts. So taking into consideration all of those different factors is how I arrived at the 90 percent.

Q How many times have you personally used the apportionment methodology in your professional capacity?

A I've conducted approximately 25 QMEs since 2012 annually. Of those, easily 60 percent I have had to discuss apportionment, in addition to -- let's say over 100. A lot. Easily over 100 times. More than 100 times. So many, many, many times I have had to look at apportionment and outline what percentage is likely due to non-incident factors or non-industrial factors and what apportionment is due to the actual incidents.

Q When you say that you have conducted apportionment for QMEs, what does QME stand for?

A Qualified Medical Evaluations for the Workers' Compensation Appeals Board. I have been working with them for over a decade and conduct at least 25 evaluations a year for them. And I'm chosen from a panel, so I'm not working for one side or the other.

Q I have no further questions at this time.

MR. BUELNA: I have a couple more. Sorry, that's how attorneys do it.

FURTHER EXAMINATION

BY MR. BUELNA:

Q Nowhere in your report do you have this 90 percent number, in either report, right?

A Well, I do.

Q Where?

A That's one of the problems, because the report that you were reading from, I'm not certain -- I don't know if that is a draft or not. I have to see what happened, because the one that I had open was not the one you were reading, and so I'm trying to figure out if the one that you have is a signed draft.

Q It is signed. I'll show it to you. It's Exhibit 2.

A Yeah, I don't know.

Q So I have no number in here. It's signed right there.

A Yeah, I saw.

Q And it's dated for August 14, 2024.

A I think there may have been a computer glitch, because I have two copies. I have what you're looking at and I have the final draft that does have a whole paragraph on this apportionment issue that we're talking about, and I don't know if that final paragraph that I included just didn't get saved.

I have sent a frantic text to my admin to find out what's going on. So if it is okay with Counsel, I would like to send that final draft -- if I could send it right now, you'll see that one paragraph. It's really just that one paragraph that is substantially different.

Q Well, let me ask you this: Did Dr. Jones quantify the PTSD symptoms in her report?

A No, she didn't talk about PT -- she didn't talk about apportionment at all. I don't know if she has --

Q So this apportionment wouldn't be any sort of rebuttal to Dr. Jones then, right?

A No, it was from my report specifically and my analysis.

Q Okay. All right. Well, then you can send your report to your counsel. I'll take a look at it. But it's about time to go and I'm not sure if we have enough time to go through, for me to sit down and look at the difference -- as much as I want to take your word, I have to read both of them.

A Yes.

Q So your counsel can send it over when she gets it, and then we can try to work it out from there.

But either way, thank you for your testimony today, Dr. Dempsey, I appreciate it. And I know you don't work for the Gaels anymore maybe?

A No, I haven't been -- I just haven't taken any new assignments.

Q But go Gaels either way, right?

A Yes.

Q Okay. Thank you.

(Whereupon, the deposition was concluded at 2:47 p.m.)

PENALTY OF PERJURY CERTIFICATE

I hereby declare I am the witness in the within matter, that I have read the foregoing transcript and know the contents thereof; that I declare that the same is true to my knowledge, except as to the matters which are therein stated upon my information or belief, and as to those matters, I believe them to be true.

I declare being aware of the penalties of perjury, that the foregoing answers are true and correct.

Executed on the _______ day of ___________, ____,

at ________________________, ______________________.

(CITY) (STATE)

________________________________

RACHYLL DEMPSEY, PSY.D.

STATE OF CALIFORNIA )
) SS.
COUNTY OF SAN MATEO )

I, ANDREA F. DANCE, do hereby certify:

That I am a duly qualified Certified Shorthand Reporter, in and for the State of California, holder of certificate number 12865, which is in full force and effect and that I am authorized to administer oaths and affirmations;

That the foregoing deposition testimony of the herein named witness was taken before me at the time and place herein set forth;

That prior to being examined, the witness named in the foregoing deposition, was duly sworn or affirmed by me, to testify the truth, the whole truth, and nothing but the truth;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me, and were thereafter transcribed under my direction and supervision;

That the foregoing pages contain a full, true and accurate record of the proceedings and testimony to the best of my skill and ability;

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the outcome of this action.

IN WITNESS WHEREOF, I have subscribed my name on this 14th day of September, 2024.

________________________________________

ANDREA F. DANCE, CSR No. 12865