DAVID CHIU, State Bar #189542
City Attorney
JENNIFER E. CHOI, State Bar #184058
Chief Trial Deputy
JOSE A. ZELIDON-ZEPEDA, State Bar #227108
LISA E. GIARRATANO, State Bar #346002
Deputy City Attorneys
Fox Plaza
1390 Market Street, Sixth Floor
San Francisco, California 94102-5408
Telephone: (415) 355-3312 [Zelidon-Zepeda]
Telephone: (415) 554-3813 [Giarratano]
Facsimile: (415) 554-3837
E-Mail: jose.zelidon-zepeda@sfcityatty.org
E-Mail: lisa.giarratano@sfcityatty.org

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO
AND JEFFREY LUBEY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY CASTEL NAVARRO, AN INDIVIDUAL,<br><br>Plaintiff,<br><br>vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO; OFFICER JEFFREY LUBEY, IN HIS INDIVIDUAL CAPACITY AS A LAW ENFORCEMENT OFFICER FOR THE SAN FRANCISCO POLICE DEPARTMENT; AND DOES 1-50, INCLUSIVE,<br><br>Defendants. | Case No. 23-cv-02402 SK (PHK)<br><br>**DECLARATION OF JOSE A. ZELIDON-ZEPEDA SUPPORTING DEFENDANTS' MOTIONS IN LIMINE**<br><br>Pre-Trial Conf Date: December 13, 2024<br>Time: 8:30 a.m.<br>Place: 450 Golden Gate Avenue<br>San Francisco, CA 94102<br>Courtroom C – 15th Floor<br><br>Trial Date: January 14, 2025 |

I, Jose A. Zelidon-Zepeda, declare as follows:

1. I am a Deputy City Attorney for the City and County of San Francisco, co-counsel for Defendants City and County of San Francisco and Officer Jeffrey Lubey. I am competent to testify to the matters in this declaration, and, if called, would so testify. I submit this declaration in support of Defendants' Motions in Limine.

2. On November 7, 2024, prior to serving Defendants' motions in limine, Defendants conferred with Plaintiff's counsel, Mr. Patrick Buelna, regarding these issues.

3. Defendants move in limine to bifurcate Plaintiff's request for punitive damages, and relatedly seek to submit confidential financial information via declaration. Attached as Exhibit 1 is a true draft of the proposed declaration regarding financial assets.

4. On February 20, 2024, Defendants took the deposition of Plaintiff in this action. Attached as Exhibit 2 are true excerpts of Plaintiff's deposition.

5. On June 7, 2024, Plaintiff served his expert witness disclosure. This disclosure included the report of Plaintiff's proffered expert, Dr. Glen Andrew Haas. Attached as Exhibit 3 is a true copy of the report by Dr. Haas, sans appendices.

6. On June 7, 2024, Plaintiff (through counsel) took the deposition of Jacob Horton, who was a San Francisco Police Department police officer at the time of the incident giving rise to this action. Attached as Exhibit 4 are true excerpts of the deposition.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed the 13th day of November, 2024, in San Francisco, California

*/s/ Jose A. Zelidon-Zepeda*
JOSE A. ZELIDON-ZEPEDA

# EXHIBIT 1

DAVID CHIU, State Bar #189542
City Attorney
JENNIFER E. CHOI, State Bar #184058
Chief Trial Deputy
JOSE A. ZELIDON-ZEPEDA, State Bar #227108
LISA E. GIARRATANO, State Bar #346002
Deputy City Attorneys
Fox Plaza
1390 Market Street, 6th Floor
Telephone: (415) 355-3312 [Zelidon-Zepeda]
Telephone: (415) 554-3813 [Giarratano]
Facsimile: (415) 554-3837
E-Mail: jose.zelidon-zepeda@sfcityatty.org
E-Mail: lisa.giarratano@sfcityatty.org

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO
AND JEFFREY LUBEY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIE M. FLANIGAN,<br><br>Plaintiff,<br><br>vs.<br><br>SAN FRANCISCO POLICE DEPARTMENT, et al.,<br><br>Defendants. | Case No. 23-cv-02402 SK (PHK)<br><br>**DECLARATION OF ____________ RE PERSONAL ASSETS AND LIABILITIES**<br><br>Trial Date: January 14, 2025 |

**DECLARATION OF ________________**

I, ________________, declare as follows:

1. I am employed with ___________________________. I have personal knowledge of the contents of this declaration, except where indicated otherwise, and I could and would testify competently thereto if called upon to do so.

2. As a ___________ my annual base salary is approximately $________. Last year, I earned approximately $_______ in overtime. As a _________, I do not receive any bonuses. My spouse's annual salary is approximately $__________.

3. My spouse and I own a home valued at approximately $__________. The home is mortgaged with an outstanding mortgage balance of approximately $_________. My spouse is on the mortgage.

4. My spouse and I have the following vehicles: (1) ________, valued at approximately $ ______; (b) ________, valued at approximately $ _____ with an outstanding balance of $______.

5. I estimate the value of my personal property (furniture, appliances, electronics, home contents) to be approximately $ ________.

6. I own no other real property.

7. I have approximately $ ________ in a joint savings account with my spouse.

8. I have approximately $ _________ in a checking account.

9. I have approximately $ ______ in my retirement account.

10. I have no other banking accounts.

11. I have approximately $ _______ in stocks, bonds, securities, or other investments.

12. I pay approximately $ ______ per month on my home mortgage and property taxes.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that I signed this declaration on October ____, 2023 at San Francisco, California.

__________________________________
Defendant

# EXHIBIT 2

Transcript of the Testimony of:

**ANTHONY CASTEL NAVARRO**

NAVARRO

vs.

CITY AND COUNTY OF SAN FRANCISCO, et al.

February 20, 2024

Volume I

IMAGINE
REPORTING

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANTHONY CASTEL NAVARRO, AN INDIVIDUAL,

Plaintiff,

vs.

CITY AND COUNTY OF SAN FRANCISCO; OFFICER JEFFREY LUBEY, IN HIS INDIVIDUAL CAPACITY AS A LAW ENFORCEMENT OFFICER FOR THE SAN FRANCISCO POLICE DEPARTMENT; AND DOES 1-50, INCLUSIVE,

Defendants.

Case No. 23-cv-02402 SK (PHK)

REPORTER'S TRANSCRIPT

VIDEOTAPED DEPOSITION OF

ANTHONY CASTEL NAVARRO

VOLUME 1

Tuesday, February 20, 2024

Via Zoom Video Conferencing

10:00 a.m.

Reported by: Rachel N. Barkume, CSR, RMR, CRR
Certificate No. 13657

A P P E A R A N C E S

FOR THE PLAINTIFF:

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
By: MARLON MONROE
LATEEF H. GRAY
Attorneys at Law
155 Filbert Street, Suite 208
Oakland, California 94607
(510) 929-5400
mmonroe@lawyersftp.com
lgray@lawyersftp.com

FOR THE DEFENDANT:

OFFICE OF THE SAN FRANCISCO CITY ATTORNEY
By: LUCIA LI
Deputy City Attorney
1390 Market Street, Sixth Floor
San Francisco, California 94102
(415) 554-4206
lucia.li@sfcityatty.org

THE VIDEOGRAPHER:

Danielle Tovar

# I N D E X


| | PAGE |
|---|---|
| EXAMINATION BY MS. LI | 5 |


--o0o--

# E X H I B I T S


| EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 1 | Screenshot from Body-Worn Camera Footage, 2022-06-17, 5:33:18Z | 92 |
| Exhibit 2 | Photographs, Navarro 000086-000089 | 120 |
| Exhibit 3 | Photographs, Navarro 000091-000094 | 125 |

BE IT REMEMBERED that on Tuesday, February 20, 2024, commencing at 10:00 a.m. thereof, via Zoom Video Conferencing, before me, Rachel N. Barkume, a Certified Shorthand Reporter in and for the State of California, remotely appeared from Da Nang, Vietnam,

ANTHONY CASTEL NAVARRO,

having been called as a witness by the Defendants, and who, having been first duly sworn by me to testify the truth, was examined and testified as follows:

THE VIDEOGRAPHER: Good morning. My name is Danielle Tovar. I'm your videographer, and I represent Imagine Court Reporting. I'm not financially interested in this action, nor am I a relative or employee of any of the attorneys or parties.

This begins Media Number 1 of Anthony Navarro in the matter of Anthony Navarro versus City and County of San Francisco, et al., in United States District Court, Northern District of California, Case Number 23-cv-02402 SK, held via Zoom conference. Today's date is February 20th, 2024, at 10:00 a.m., Pacific Standard Time.

The certified court reporter from Imagine is Rachel Barkume. And this deposition is being recorded at all times unless all counsel agree to go on or off the video record.

excessive force. So if -- I knew if I said something, for me, I knew he was going to do something even worse or make it even more harder for me, so I just shut up.

And obviously I knew when he told that officer that he got this -- he has this -- he said, "I got it" or whatever, that he was doing this on purpose.

Q. Okay. So have you ever been arrested before, Mr. Navarro?

A. No.

Q. Have you ever been in handcuffs before?

A. No.

Q. Do you have any specialized training on police procedures?

A. No specialized, no.

Q. So what distinction do you make -- what experience do you have about police procedures?

A. I have no experience of police procedures.

MR. MONROE: Objection. That -- that question's vague. He can get knowledge of police procedures by watching TV. I mean, let's get a little more specific with the questions, please.

THE WITNESS: Yeah, can you --

BY MS. LI:

Q. Well, you did answer, Mr. Navarro, that you have no --

A. Well, I know that police aren't supposed to lift you up like this from your handcuffs. I know that they're supposed to support you and treat you like a human being.

Q. Okay. I understand that's your testimony.

And my question is more specific to the position that you were escorted in.

A. That's --

Q. Do you have any -- do you have any experience in police procedures about how somebody is to escort an arrested person?

A. I think it's common sense to not do what they did to me. So --

Q. Okay.

A. I've seen people being arrested before on the street, on TV, in movies and documentaries, and I know that's not how you're supposed to arrest someone.

Q. Okay. So other than what you saw in movies, TV, and maybe personal -- witnessing other people being arrested, safe to say you don't have any training or experience about arrest procedures; correct?

A. I don't.

Q. And during the escort, you had not indicated to any officer on scene that you were in pain; correct?

A. I can't recall to -- to my memory of saying

officer did to you?
A. Used excessive force and abused his power.
Q. Scrolling to this photo ending in 088.
Is this the photo of the citation you received from this incident?
A. Yes.
Q. When did you take this photo?
A. Probably shortly after too.
Q. When shortly -- when you're referring to "shortly after," are you talking about the day after this incident or some other period of time?
A. Either right after the incident, that same night, or the next day; in between that, very shortly after.
Q. Were you informed that you should go to court on July 11th, 2022?
A. Yes.
Q. Okay. And did you take any steps to inquire whether or not you needed to go to court?
A. Yes.
Q. What steps did you take?
A. I talked to different lawyers and different people on what steps to take.
Q. Did you have to appear in court on July 11th, 2022?

A. I didn't have to.
Q. As far as you know, are there pending criminal charges against you for your actions from this incident?
A. From what I know, no, there's not.
Q. Did you ever have to appear in court on a criminal matter relating to this incident?
A. No.
Q. Okay. Moving on to the last photo here with the label ending in 089.
Do you recognize the person depicted in this photo?
A. Yes.
Q. Who is this?
A. Officer Jeffrey Lubey.
Q. You -- is this the photo that your sister took of Officer Lubey?
A. Yes.
Q. Were you present when this photo was taken?
A. Yes.
Q. And Officer Lubey allowed his picture to be taken?
A. I don't know. She didn't ask. She just took the picture.
Q. Okay. I'm going to stop sharing.
You mentioned that you had posted on Instagram

CERTIFICATE OF STENOGRAPHIC REPORTER

I, RACHEL N. BARKUME, a Certified Shorthand Reporter of the State of California, hereby certify that the witness in the foregoing deposition,

ANTHONY CASTEL NAVARRO,

was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein named; that the testimony of said witness was stenographically reported by me, a disinterested person, and was thereafter transcribed into typewriting.

Pursuant to Federal Rule 30(e), transcript review was requested.

I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

DATED: March 1, 2024.

Rachel N. Barkume

Rachel N. Barkume, CSR No. 13657, RMR, CRR

# EXHIBIT 3

# Analysis of Contact and Use of Force Against Anthony Navarro

Anthony Navarro v. City and County of San Francisco et al.

Pointer & Buelna, LLP
155 Filbert St. Ste 208
Oakland, CA 94607

Prepared by:
Dr. Glen Andrew Haas
304 South Jones Blvd. #1211
Las Vegas, Nevada 89107

TABLE OF CONTENTS


| | | | |
|---|---|---|---|
| I. | Introduction | | 1 |
| II. | Assignment | | 1 |
| III. | Summary of Opinions | | 1 |
| IV. | Qualifications | | 2 |
| V. | Documents Reviewed | | 6 |
| VI. | Background | | 10 |
| VII. | Opinions and Supporting Facts | | 12 |
| VIII. | Conclusions | | 41 |
| IX. | Appendix A | Curriculum Vitae | 43 |
| X. | Appendix B | Statement of Compensation | 47 |
| XI. | Appendix C | Publications & Previous Expert Testimony | 49 |

## I. Introduction

I am Glen A. Haas. I retired as a Police Commander from the Cathedral City Police Department in 2018. Before my retirement, I was the Investigations Bureau Commander. My law enforcement experience included 23 years with the Cathedral City Police Department, six years with the Palm Springs Police Department, and two years with the Riverside County Sheriff's Department's Indio Station. I have a total of 31 years in law enforcement. I have expertise in law enforcement policies, procedures, and practices, use of force, and conducting, supervising, and managing criminal and administrative investigations. I am the former President/C.E.O. of Operant Learning Systems, Inc. Operant is a firm that developed and presented education and training material to public safety agencies, corrections, and probation departments. My curriculum vitae is attached to this report as Appendix A. My business address is 304 South Jones Blvd #1211 Las Vegas, Nevada 89107.

## II. Assignment

The Pointer & Buelna Law Firm retained me to review and evaluate the actions of members of the San Francisco Police Department concerning the contact and use of force against Anthony Navarro. Additionally, I was asked to review relevant department policies related to the use of force.

## III. Summary of Opinions

My overall opinions are:

a. Lubey's use of force was unreasonable and unnecessary.

b. Ofc. Lubey arrested and booked Navarro for 148(a)(1) PC – Resisting, Obstructing, or Delaying a Peace Officer, knowing he did not violate that statute.

**IV. Qualifications**

I hold a Doctorate in Public Administration with an emphasis in Organizational Behavior from Valdosta State University, an M.S. in Education and a B.S. in Workforce Education from Southern Illinois University, an M.A. in Strategic Communication from Texas Tech University, and an MS in Management and Leadership from Western Governor's University. My doctoral research focused on the influencing effects of police officer behaviors during and after conflict. My graduate research at SIU focused on employee performance assessment and evaluation within police departments. My graduate research at TTU focused on how framing influences graphic police actions in critical incident briefings. The focus of my research at WGU involved leadership challenges within medium-sized municipal police departments.

I attended the Riverside County Sheriff's Department Basic Academy in 1987 and served as a Riverside County Deputy Sheriff in the Coachella Valley until 1989. From 1989 to 1995, I worked as a Senior Police Officer for the Palm Springs Police Department (P.S.P.D.). I worked as a patrol officer and K-9 Officer, and I was responsible for training officers in the use of force, arrest control tactics, and baton techniques. I worked in uniform and undercover in a street crime assignment, conducting vice, narcotics, and property crime investigations. In this role, I was responsible for or assisted in many responsive operations related to narcotics, alcohol violations, fugitive apprehension, burglaries and theft, and prostitution.

In 1995, I worked as a Senior Police Officer for the Cathedral City Police Department (C.C.P.D.), investigating patrol-related complaints. I was assigned to train officers in use of force, self-defense, arrest control tactics, baton techniques, TASER use, and force reporting requirements. While a patrol officer at C.C.P.D., I was appointed as a Business Liaison Officer. I conducted investigations related to local business interests and coordinated traditional and non-traditional responses. I also worked as a Field Training Officer, where I was responsible for training and directing newly hired police officers. During this time, I was an active member of the Police Association (including three terms as President). I represented the rank-and-file officers in salary and employee benefit planning, minor disciplinary actions, and work-related grievances. In 1997, I attended POST-certified Interview and Interrogation training for Patrol Officers, and in

2006, I attended advanced POST-certified Interview and Interrogation training and P.O.S.T. Criminal Investigation training.

In 2007, I was promoted to sergeant, where I supervised a patrol shift of officers and often worked as the Watch Commander. I supervised each officer's performance during their investigations and reviewed and corrected their written reports. I had the collateral duty of Field Training Program Administrator, where I supervised and directed the training efforts of all newly hired officers and the training officers in the program. These duties included supervising each officer's performance in their investigations, reviewing their written reports, and reviewing their daily performance evaluations. I continued as a use of force and TASER Instructor. I completed the California Peace Officer Standards and Training (POST) Supervisory Course in 2007, the POST Officer-Involved Shooting and Supervision/Management Course in 2008, and the POST Field Training Program Supervisor/Administrator Course in 2008.

In 2009, I was promoted to Lieutenant and assigned to the Investigations Bureau, where I managed all investigations within the C.C.P.D. I was responsible for the supervision of the sergeants and the management of the overall unit. I worked with sergeants to evaluate and direct individual investigations deemed insufficient, problematic, politically sensitive, or critical. I managed all investigations, including undercover operations, gang-related, sex crimes, domestic violence, property crimes, robberies, homicides, and internal administrative investigations. I was responsible for in-custody death investigation management, and I developed training in this discipline and trained officers, firefighters/medics, and dispatchers in this subject. I managed high-profile, responsive operations and led on-scene investigative operations for major incidents. As a collateral duty, I administered the department's policy and procedure manual. I was responsible for content validation and advocacy, biannual review and revision, and research related to all departmental policies.

In 2009, I completed the P.O.S.T. Management Course and the POST Assertive Supervision Course. In 2010, I completed the P.O.S.T. Internal Affairs Investigation Course, In-Custody Death Investigation training, and the P.O.S.T. Situational Leadership Instructor Course.

In 2011, I was assigned as the Administrative Lieutenant, managing the department's communications resources, records division, and elements of the department's grant process. During this time, I was responsible for the employee improvement efforts of officers whose performance was deemed unsatisfactory. I reviewed and evaluated these officers' investigation efforts, report writing, time management, tactics, and decision-making. In 2011, I completed the P.O.S.T. Ethics in Police Management Instructor Course, the Los Angeles Police Department/West Point Leadership Academy, and the P.O.S.T. Executive Development Course.

From 2012 to 2015, I was assigned as the Patrol Watch Commander, managing the department's patrol, training, and jail operations. I was responsible for reviewing all critical investigations, reviewing administrative investigations, and reviewing all patrol-related performance evaluations. My assignment as jail manager required me to ensure compliance with mandates from the California Board of Corrections and Riverside County. In 2012, I completed the P.O.S.T. Human Factors & Threat/Error Management Course and the P.O.S.T. Officer Safety & Force Encounter Analysis Course. In 2013, I completed the Force Science Institute's Force Analysis Program.

In 2015, I was re-assigned as the Investigations Bureau Commander with the added responsibility of developing recruitment and hiring strategies and managing all background investigations. Once the recruiting/hiring strategies were implemented, I reviewed, evaluated, and directed all investigations into candidates and recruits. In 2015, I completed the POST Racial Profiling Instructor Course, P.T.S.D., T.B.I., & Trauma Training Course, POST Background Investigator Course, and Background Investigation Command Officer Course. I retired from the Cathedral City Police Department in 2018 with the rank of Commander.

From 1993-1994 I was an adjunct faculty member at Mount San Jacinto Community College in Menifee, California, where I taught Personal Communications and Patrol Procedures.

From 1994-2007 I was an adjunct faculty member at College of the Desert in Palm Desert, California, where I taught defensive tactics, arrest control tactics, and Field Training Officer evaluation.

From 1994 to 2005, POST selected me as a Regional Trainer in the use of force proctor training and testing. In this collateral position, I presented training to force instructors statewide and supervised the testing processes. This position required me to work with various agencies throughout the state, maintain objectivity regarding the course material, and respond to instructor concerns.

From 1999 to 2005, I worked as an independent consultant at POST to develop, test, and evaluate new instructor use of force testing processes across California. This position expanded into developing advanced training processes, institutional evaluations, training design supervision, and administrative investigations as a subject matter expert in training and using force.

From 2001-2003, I worked as an adjunct faculty member and special project consultant for Riverside Community College in Riverside, California. There, I consulted with the Dean and staff on technology integration and curriculum delivery.

In March 2020, I was hired by National University as an Adjunct Professor in the College of Law and Professional Studies, where I teach Introduction to Criminology, Ethics in Law Enforcement, Policing and the Media, and Investigation Procedures.

In November 2020, I was hired by Southern Illinois University as an Assistant Professor of Practice in the School of Education, where I teach Organizational Analysis, Training Systems Management, Foundations of Workforce Development, Assessment of Learner Performance, and Workforce Education Needs Assessment.

As an instructor for Operant Learning Systems, Inc., I developed and taught an advanced law enforcement course titled Communication Strategies for Conflict. I designed this course using research gained during my doctoral work. The course was certified in 2019 by the State of California and awarded a grant for innovative training.

I am currently an Assistant Professor of Criminal Justice at Utah State University, where I teach Intro to Criminal Justice, Corrections, and Security in Practice. I am also the coordinator of the university's new statewide public safety leadership program, where I developed the concept and designed the program and curriculum.

**V. Documents/Information Reviewed**

As part of my assignment, I have reviewed the following documents:

- San Francisco Police Department Policy Manual
- 2023-08-07 Defs Initial Disclosures
- BWC Footage: CCSF-Navarro_000025 – Officer Fauble_#1520.mp4
- BWC Footage: CCSF-Navarro_000026 – Officer Andrakin _#2175.mp4
- BWC Footage: CCSF-Navarro_000027 – Officer Byrd_#916.mp4
- BWC Footage: CCSF-Navarro_000028 – Officer Cubas_#274.mp4
- BWC Footage: CCSF-Navarro_000029 – Officer Girvin_#1345.mp4
- BWC Footage: CCSF-Navarro_000030 – Officer Horton_#1489.mp4
- BWC Footage: CCSF-Navarro_000031 – Officer Li_#1074.mp4
- BWC Footage: CCSF-Navarro_000025 – Officer Lubey_#1389 1 of 2.mp4
- BWC Footage: CCSF-Navarro_000025 – Officer Lubey_#1389 2 of 2.mp4
- BWC Footage: CCSF-Navarro_000025 – Officer St Clair_#2487.mp4
- BWC Footage: CCSF-Navarro_000025 – Sgt._Sheehan_#550.mp4
- SFPD Reports: CCSF-Navarro_000001-000035.pdf
- Certificate20240227LubeyJeffrey-NDS295904.pdf
- 2024-02-27_JeffreyLubey_295904.smi
- NDS295904-TransmittalLetter.pdf
- SFPD Training Material: CCSF-Navarro_000036-001244.pdf
- CCSF-Navarro_001238 – 2234-2234 dt.wav
- CCSF-Navarro_001240 – 2236-2237 dt.wav
- CCSF-Navarro_001241– 2238-2238 dt.wav

- CCSF-Navarro_001239 – 2235-2235 dt.wav
- CCSF-Navarro_001243 – 2249-2250 dt.wav
- CCSF-Navarro_001242 – 2246-2246 dt.wav
- Fundamental of Biomechanics, Equilibrium, Motion, and Deformation 4th Edition
- Amateur Boxer Biomechanics and Punch Force, Mack et al.

Depositions

- Navarro, Anthony. February 20, 2024, Volume 1
- Navarro, Anthony. February 23, 2024, Volume 2
- Lubey, Jeffrey. February 7, 2024

## VI. Background

The following background is based on my understanding from my review of the materials provided. Anthony Navarro was arrested for battering a police officer and resisting, obstructing, or delaying a police officer in the performance of his duties. This arrest occurred after the Golden State Warriors' championship win. The anticipated crowds resulted in an increase in police staffing and fans celebrating in the streets. Navarro was one of those celebrating.

Navarro had been at a bar named Dr. Teeth to watch the Warriors game with family and friends. He ate and drank margaritas at Dr. Teeth, left the bar, but returned because he forgot his credit card. There was a celebratory atmosphere as he walked back to his car. He saw Ofc Horton and tried to share the celebration by yelling “Go Warriors” and trying to shake his hand. Horton didn’t respond and walked away, but Navarro followed and kept trying.

Ofc Lubey was following Navarro and Horton and told him to stop and move away as he walked past him. Ofc Lubey alleged Navarro shoved him from his blind spot. Ofc Lubey turned, took Navarro to the ground, and arrested him for Battery on a Peace Officer and Resisting, Obstructing, or Delaying a Police Officer.

**VII. Opinions and Supporting Facts**.

**A. Lubey's use of force was unreasonable, unnecessary, and excessive.**

Lubey's decision to use force against Navarro was unreasonable, given the circumstances described and the information available. It was based on decision-making inconsistent with SFPD practices and an application that was unreasonable and unnecessary for the circumstances presented to Ofc. Lubey. Additionally, the use of force was excessive in its implementation.

1. Unreasonable Assessment of the Situation Leading to the Use of Force.

a. Lubey's contention that the person climbing the pole presented a significant threat to personal/public safety, sufficient that Navarro's less than 5-second interaction with Ofc. Horton was a violation of 148(a)(1) PC[2] ignores the multitude of other equally (or more) dangerous actions that police ignored. Neither Lubey's nor Horton's report indicates that Navarro knew they were attempting to discharge their duties, which would be an important element of that crime. Officers were crossing a street in front of Navarro when he contacted them, yelled, "Go Warriors," and tried to shake their hands[3].

b. Officer Horton assessed Navarro and dismissed him as a threat or violator of 148 (a)(1) as Ofc. Horton did not attempt to detain, arrest, or take any other action. Ofc. Horton's Incident Report stated that Navarro "grabbed" him while yelling "Warriors.".[4] Ofc. Horton's report does not describe the grab or Navarro's attempt to "hold onto" him as an attack, a hostile act, aggression, violence, or a willful attempt to prevent him from discharging his duties. Ofc. Horton's report is not inconsistent with Navarro's statements and describes a man who perhaps thoughtlessly tried to celebrate an important basketball win with a local police officer. Ofc. Horton would have been in the best position to assess Navarro's actions as they

[2] Lubey Initial Report_CCSF-Navarro_000004
[3] Navarro Deposition. Volume 1, p. 49, lines 6-9, p. 50, lines 17-18, p. 51, lines 2-3
[4] Horton Incident Report narrative. P.1 – CCSF-Navarro_000006

related to him being delayed or obstructed from his duties, and he did not start an enforcement action. Lubey saw this interaction.

c. Lubey knew or should have known, that a crowd was assembling to celebrate a Warriors basketball win. While officers must be aware of threats from these crowds, they must also balance that against the need to assess potential threats properly. Not every approach by a citizen is an attack, and such a belief puts the officer and all citizens at risk.

d. Lubey knew or should have known, that some people in the crowd would be under the influence of alcohol, excited over the win, angry at a loss, or a combination of these. He was expected to maintain a professional demeanor despite a person's intoxication and factor that into his decision-making and actions.[5]

e. Lubey's contention that he was shoved from his blind spot and thus Navarro committed Battery on a Police Officer (243(b) PC) is motivated reasoning at best. Lubey's conclusion here is flawed as he failed to take into consideration the celebratory nature of the surroundings (environmental awareness)[6], Navarro's potentially imprudent but non-hostile behavior with Horton, Horton's dismissal of Navarro as a threat or hindrance to his objective of dealing with the man on the light pole, and Navarro's lack of "pre-assault" behaviors towards Lubey.[7]

Additionally, Lubey did not see Navarro shove or push him. Lubey could not describe how he was shoved, and Lubey did not say that Navarro made any hostile, threatening, aggressive, or even insulting statements before or during the alleged contact. These are significant since they would provide detail and context as to whether or not the contact was willful and done so in a harmful and offensive manner.

---

[5] San Francisco Police Department Peace Officer Field Training Manual_CCSF-Navarro_000576
[6] SFPD LE Regional Training Center Basic Course Arrest & Control Manual_Tactical Overview_CCSF-Navarro_000511
[7] SFPD LE Regional Training Center Basic Course Arrest & Control Manual_Tactical Overview_CCSF-Navarro_000511

f. Lubey didn't know how he was shoved. He could provide no additional information in this area other than he turned and saw Navarro. Given the limited information provided by Lubey, there is a possibility that any contact was inadvertent. This cannot be disputed since Lubey only felt contact and could not provide any other objective information.

When considering Lubey's lack of detail in describing the alleged contact, Navarro's pre-contact behavior, including his celebratory actions towards Ofc. Horton suggests the contact, if it occurred, was at least as likely to have been accidental.

2. Lubey's assertion that Navarro ambushed and shoved him is refuted by available evidence.

Ofc. Lubey claims he was shoved during an ambush-style attack by Navarro. This was the basis for Lubey's arrest of Navarro for 243(b) PC. Neither the BWC video from other officers nor Ofc. Lubey's own BWC footage supports this claim.

a. Ofc. Li's BWC footage does not support Ofc. Lubey's claim of being ambushed, shoved, or attacked.

Ofc Li's BWC video provides some clarifying information as to what occurred between Ofc. Lubey and Navarro. While Ofc. Li's video quality is sub-optimum, it does provide probative information. For clarification, the Axon Body Worn Camera worn by officers during this incident records at a frame rate of 30 frames per second.[8]

Ofc. Li's BWC video starts at 05:33:20. Navarro could be seen facing a southerly direction in his yellow shirt, just outside the south edge of the crosswalk on the north side of the intersection (21st Street and Mission Street). A figure with dark clothing was in front of (south of) Navarro at about a 90-degree angle. Frame #2 provides a slightly better image than frame #1. In frame #2, both subjects' feet are approximately on the same plane. The

[8] https://my.axon.com/s/article/Axon-Body---Previewing-videos-in-the-field?language=en_US#:~:text=The%20video%20streams%20at%20a,Fi%20for%20viewing%20live%20video.

dark figure appeared to be Ofc. Lubey and Navarro appeared to be positioned to his left side. This figure is likely Ofc. Lubey as he took Navarro to the ground in the next several frames. Frame #3 showed Navarro and Lubey still close to each other. The image became blurred due to Ofc. Li's motion as he turned to his left. Frames #4-#14 (duration of approximately .33 seconds) are blurred, but Navarro can be seen. In frames #15-#25 (duration of approximately .33 seconds), neither Navarro nor Lubey can be seen as the camera has moved to the left and back to Ofc. Li's right. In frame #26, Navarro is partially in view on the right side of the image, but the video is still blurred. Navarro comes back into view completely in frame #27, and the video is still blurred. In frame #28, it appears Lubey has already initiated his takedown of Navarro. This is about .77 seconds[9] after they were seen standing near each other with no push, shove, or ambush visible or apparent.

By frame #30 (duration of approximately 1 second) Ofc. Lubey appeared to be to Navarro's left side and east of him. Navarro's body was still facing south.

In frame #38 (duration of approximately .27 seconds from frame #30) Ofc. Lubey was seen more clearly in contact with Navarro. Ofc. Lubey was northeast of Navarro and both were facing south.

In frame #40, Ofc. Lubey was facing east. Navarro was on Ofc. Lubey's right side (south) and he is off balance. This is evident since Navarro's hips and shoulders are well forward of his feet, and he appears to be falling forward in an easterly direction.

b. Ofc. Lubey's own BWC footage disproves his statements that he was ambushed, pushed, or shoved.

Lubey's BWC video recording (05:33:18, frame 7) showed Ofc. Horton moved away from Navarro. Both Navarro and Ofc. Horton were directly in front of Ofc. Lubey. From 05:33:18, frame 7, to 05:33:19, frame 19 (1.4 seconds), Navarro was in front of and to Ofc. Lubey's left. Navarro was close to Ofc. Lubey until Navarro moved off the left side of the

[9] Frame rate = 30 fps. 23 frames = 23 sec / 30 frames. 23 frames ≈ .767 seconds

screen out of camera view. From 05:33:19, frame 20, to 05:33:20, frame 8 (.6 seconds) Ofc. Lubey continued east behind Horton.

Despite Ofc. Lubey's contention that he was "ambushed,"[10] "attacked,"[11] and strongly pushed[12] there was no sudden camera movement on his BWC video consistent with a shove, nor was there any sudden camera movement consistent with a shove strong enough to have caused him to lose his balance and push him out of his "normal walking gait."[13] A sudden shove, with sufficient force to make him lose balance would be apparent on the BWC video. The video would likely contain sudden and erratic camera framing. However, Ofc. Lubey's BWC video is steady from when he walked by Navarro (05:33:19, frame 19) until he turned to his left at 05:33:20, frame 9.

Ofc. Lubey's left turn was continuous and fluid, with no evidence of a forceful shove depicted in the video. Ofc. Lubey's counterclockwise turn was continuous until he had taken Navarro to the ground and was on Navarro's back. Ofc. Lubey had passed by Navarro and, about .7 seconds later, initiated his takedown. According to Lubey, he was pushed hard enough in his left shoulder to stumble[14] and lose his balance sufficient to change his gait. He then regained his balance, oriented himself, assessed the situation, and concluded the physical contact was criminal (willful and harmful) and not incidental or celebratory. He then started to take Navarro to the ground. Ofc. Lubey's contends this occurred in under one second (24 frames = .8 seconds), but this claim is dubious.

c. Ofc. St. Clair's BWC footage does not support Ofc. Lubey's claim of being ambushed, shoved, or attacked.

Ofc. St. Clair's BWC video shows the interaction between Navarro and Ofc. Horton near the west curb line of Mission St. Navarro approached Ofc. Horton at 05:33:12, frame #1.

[10] Lubey Deposition, p. 118, lines 8-10; p. 42, line 22; p. 43, line 23;
[11] Lubey Deposition, p. 27, lines 15-17; p. 42, lines 21-25; p. 43, lines 11-12; p. 112, lines 24-25; p. 113, lines 25-24
[12] Lubey Deposition, p. 40, lines 7-9.
[13] Lubey Deposition, p. 99, lines 7-19
[14] Lubey Deposition, p. 29, line 16.

The interaction lasts until about 05:33:19, frame #10, though the picture is obscured until 05:33:19, frame 23. At that time, Navarro and Ofc. Lubey can be seen in the intersection, standing very close to one another. Ofc. Horton is in front of Ofc. Lubey and they are walking in a southeast direction. Navarro is next to Ofc. Lubey's left side and is facing in a more southerly direction.

At 05:33:19, frame #2, Ofc. Lubey and Navarro appear to have separated slightly as a background vehicle light/reflection can be seen between them about waist height. Navarro's right arm can be seen perpendicular to the ground. At 05:33:20, frame 19, Navarro is standing with his feet parallel to his shoulders with his right arm still hanging down. Ofc. Lubey appears to have turned slightly to his right towards Navarro.

At 05:33:20, frame #27, the camera's view of Ofc. Lubey and Navarro is blocked by two pedestrians. 05:33:19, frame 12, they reenter the camera view with Navarro appearing to be in a midstance phase of walking.[15] At 05:33:21, frame #14, it appears contact between Navarro and Ofc. Lubey may have occurred, but there is no evidence of a shove, push, attack, or ambush. Navarro's right arm is still down along his side. Although the video is not entirely clear, Navarro's arm position can be determined by the contrast between his blue sleeves and bright yellow shirt. At 05:33:21, frame 19, the camera view is blocked by a pedestrian again. When Navarro and Ofc. Lubey are visible again (05:33:21, frame 27) .26 seconds later, Ofc. Lubey has already started taking Navarro to the ground.

There is no visible evidence Navarro shoved, pushed, attacked, or ambushed Ofc. Lubey. If there was physical contact between the two before the takedown, it is unclear whether this was intentional or accidental.

d. Ofc. Andrakin's BWC footage does not support Ofc. Lubey's claim of being ambushed, shoved, or attacked. At 05:33:17, frame #1, Navarro can be seen in the crosswalk near officers. It appears this is during his interaction with Ofc. Horton. At 05:33:17, frame #29,

[15] The point while walking when the body is supported by one leg and the legs are farthest apart in the sagittal plane (front to back direction).

an officer's outstretched arm can be seen near or contacting Navarro's chest. This appears to be when Ofc. Horton pushed Navarro away before disengaging with him and continuing to walk to the man on the pole.[16] From 05:33:19, frame 1, to 05:33:19, frame 16, Navarro and Ofc. Lubey are in close proximity to each other near the southern edge of the north crosswalk across Mission Street. At 05:33:19, frame 15, Navarro does appear to raise his right arm, but the view is blocked by officers. At 05:33:21, frame 4, Navarro's feet come back into view, and it appears Ofc. Lubey had already begun taking Navarro to the ground.

Ofc. Andrakin's BWC video provides no visible evidence Navarro shoved, pushed, attacked, or ambushed Ofc. Lubey. Whether there was physical contact between Lubey and Navarro was unclear.

e. Ofc. Byrd BWC footage does not support Ofc. Lubey's claim of being ambushed, shoved, or attacked.

At 05:33:15, frame 1, Navarro can be seen interacting with Horton in the crosswalk. They walk in a southeastern direction through the intersection. At 05:33:19, frame 1, Navarro can be seen facing south with his right side and back towards Ofc. Byrd's camera. Navarro's left arm is blocked by his body and his upper right arm is perpendicular to the ground, while his forearm is at a less than 90° angle to the ground. At 05:33:19, frame 11, just before Ofc. Li's head blocks the view Ofc. Lubey's left side, Navarro's arm had straightened, and his forearm was more perpendicular to the ground. Navarro's back does not move suddenly or dramatically during this time, which would indicate a forceful shove (sufficient to cause a 200 lb. man to lose balance). From 05:33:19, frame 11, until Navarro is blocked by Ofc. Bird's hand (05:33:19, frame 23) Navarro's right arm is seen down along his right side.

Ofc. Byrd's hand blocks three (3) frames (05:33:19, frame 23-25, 0.1 second), and Ofc. Li's head blocks the view of Ofc. Lubey and Navarro from 05:33:19, frame 26 until 05:33:20, frame 16 (.66 seconds), when Navarro's white shoes can be seen emerging from to the right of Ofc. Li. At 05:33:20, frames 18-25, Navarro's yellow shirt can now be seen. At 05:33:20,

[16] Lubey BWC video, 05:33:18, frames 1-11)

frame 26, the image is blurred. At 05:33:21, frame 1, the video cleared, and Navarro can be seen over Ofc. Li's right shoulder. From the subsequent video frames, Navarro was already being taken down to the ground.

3. Navarro was not "placed"[17] on the ground as described by Lubey. The takedown was violent and forceful.

Ofc. Lubey described the takedown of Navarro as "placing him on the ground…"[18] This euphemistic language, or obfuscation, intentionally minimizes the seriousness of the act. A person with Lubey's education and experience can clearly understand the difference between force used to take a person to the ground and placing that person on the ground. Yet, he chose to describe the dynamic movement of forcing someone to the ground as "placing" Navarro on the ground. This is inexplicable since Ofc. Lubey knew a takedown was, as part of his training, a force option.[19] Ofc. Lubey knew this through his training, and he demonstrated this knowledge in his written and official police report for this incident when he wrote, "I immediately turned back to face Navarro and used a control hold/take down to ***force*** Navarro to the ground…"[20]

Ofc. Lubey did not describe something he witnessed; he described his own actions. The BWC video does not depict Ofc. Lubey executing a move that controlled Navarro's descent to the ground to avoid injuring him while ensuring his safety. The BWC showed Ofc. Lubey took Navarro off balance and forced him to the ground face first, where Navarro impacted the hard asphalt roadway. Navarro's body was then subjected to additional impact force as Ofc. Lubey landed on top of Navarro's back.

Frames 41-42 (Ofc. Li's BWC) showed Ofc. Lubey pivoted on his right foot as he turned to his left. Navarro was still off balance and being taken down in a counterclockwise, circular motion, a common takedown.

---

[17] Lubey Deposition, p. 52, line 5.
[18] Lubey Deposition, p. 52, lines 2-3.
[19] CCSF-Navarro_000036-001244.pdf, CCSF-Navarro_001004
[20] CCSF-Navarro_000035.pdf / SFPD Incident Report #220396174, p. 3, para. 3

Frames #43-#54 (Ofc. Li's BWC) showed the continuation of the takedown. Ofc. Lubey continued his pivot and forced Navarro towards the ground with Ofc. Lubey above him with his upper body in contact with Navarro's back just before Navarro impacted the ground.

In frame #49 (Ofc. Li's BWC) Ofc. Lubey's left foot was perpendicular to the ground with his toe down and heel up. His right leg was bent with his lower leg at an acute angle to the ground, and his upper body was well forward of his left foot. This position cannot support body weight, so it is evident both Ofc. Lubey and Navarro are falling towards the ground.

In frame #54 (Ofc. Li's BWC), Ofc. Lubey's right arm is positioned over Navarro's right shoulder, and his right hand is across Navarro's chest before they impact with the ground.

Frames #55-#78 (Ofc. Li's BWC) show the completed takedown, and Ofc. Horton and Ofc. Faubel have turned and started moving towards Ofc. Lubey. Ofc. Lubey's upper torso is on Navarro's back, and his unsupported legs are stretched away from Navarro (towards the south). Navarro is positioned with his head towards the west and his feet towards the east. Navarro appears to contact the ground on frame #56 or #57.

Ofc. Faubel's video (05:33:21) provides a reverse view of Ofc. Li's. Ofc. Lubey's body position and contact with Navarro show his upper torso on top of Navarro and his legs outstretched in a southerly direction. Ofc. Lubey's feet can be seen, and the soles of his shoes are at a nearly right angle to the ground, with the heels and toes almost parallel to the ground. This demonstrates the latter portion of the takedown was unsupported or controlled, and Navarro absorbed Ofc. Lubey's body weight as they impacted the ground.

By frame #60 (Ofc. Li's BWC), Navarro is on the ground, face first, with Ofc. Lubey having landed on top of him. Since Ofc. Lubey was also off balance at frame #53, and it is evident his 200 lbs. body weight[21] was added to the force of Navarro impacting the ground. Navarro

[21] Lubey Deposition, p. 111, line 23

was subjected to impact force[22] as a result of being taken to the ground by Ofc. Lubey. Navarro was also subjected to considerable additional impact force as Ofc. Lubey landed on Navarro during the takedown.

Ofc. Lubey's misleading description of the takedown during his deposition is inexplicable given his knowledge of what constitutes force and his previous description of the takedown as a use of force.

After reviewing the BWC video, I concluded that this takedown was inconsistent with "placing" someone on the ground. I conducted an analysis of Navarro's impact force and found he experienced two significant forces: the impact force from hitting the ground and the force from Ofc. Lubey landing on him. The following calculation provides a fair estimate of the impact force felt by Navarro by:

- Modeling the physics of the fall considering angles, velocities, and impact durations.
- Reflecting the concentrated nature of the impact on Navarro's body, particularly his face and chest.
- Accounting for the additional force exerted by Lubey landing on Navarro, considering his weight and fall dynamics.
- Using calculations based on well-established principles of physics, including kinematics and the impulse-momentum theorem.
- Using principles that are widely accepted and reliable for estimating impact forces in scenarios like falls and collisions.

I considered the following factors in my calculation:

Fall Dynamics and Angle of Impact:

- Navarro fell at a 45-degree angle, affecting the distribution of the impact force across his body. The fall dynamics were accounted for by decomposing the velocity into horizontal

[22] A force that delivers a shock or high trauma in a relatively short period of time.

and vertical components, providing a realistic estimate of the forces experienced in both directions.

Body Position and Contact Area:

- Navarro's face and chest hit the ground first, concentrating the impact force on a smaller area, which increases local pressure and injury severity. This was considered to provide a more accurate representation of the injuries sustained.

Lubey's Off-Balance Fall:

- Lubey, weighing 200 lbs with an additional 15 lbs of gear, also fell at a 45-degree angle. His fall dynamics were incorporated to estimate the force he exerted on Navarro upon landing, considering both his weight and fall angle.

Impact Duration:

- An estimated impact duration of 0.2 seconds was used for both impacts, which is a typical value for such scenarios, allowing for a realistic calculation of the forces using the impulse-momentum theorem.

Impact Force Calculation

Impact force calculation involves determining the force exerted on an object (in this case, Navarro) when it experiences a sudden change in velocity, typically during a collision or fall. This calculation takes into account:

- Change in Velocity: How quickly the object's velocity changes during the impact.
- Mass of the Object: The weight of the object involved in the impact.
- Duration of Impact: The time over which the impact occurs, which influences the deceleration and the force experienced.

Steps in the Calculation:

a. Velocity Calculation:

- Determined Navarro's and Lubey's velocities just before impact using the free fall equation.
- Decomposed these velocities into vertical and horizontal components considering the 45-degree fall angle.

b. Force Calculation:

- Applied the impulse-momentum theorem ($F = \frac{m\Delta v}{\Delta t}$) to calculate the forces experienced by Navarro and Lubey during the impact.
- Considered the mass of each individual and the duration of the impact to find the force in Newtons.

c. Combination of Forces:

- Summed the vertical components of the forces from Navarro hitting the ground and Lubey landing on Navarro to find the total impact force experienced by Navarro.

Considerations for Accuracy:

- Angle of Impact: Adjusted the velocities to account for the 45-degree fall, which affects how the forces are distributed across Navarro's body.

- Body Position: Considered the specific body parts (face and chest) that hit the ground first, concentrating the force on these areas.

- Off-Balance Fall: Included the off-balance nature of Lubey's fall, which affects how the impact force is distributed.

Conclusion:

These calculations are a comprehensive approach to *estimating* the impact force experienced by Navarro. By considering the mass, velocity, angle of impact, and duration, I have quantified the

forces during both the initial ground impact and the subsequent force exerted by Lubey landing on his back. This methodology is consistent with standard practices in physics for calculating impact forces.

Step-by-Step Calculations

1. Calculate Velocity of Impact for Navarro

- Fall height: 4 feet (1.22 meters)
- Angle of fall: 45 degrees
- Acceleration due to gravity ($g$): 9.81m/s$^2$

$$v = \sqrt{2 \times 9.81\, m\,/\,s^2 \times 1.22\, m} \approx \sqrt{23.94} \approx 4.89\, m\,/\,s$$

2. Decompose Velocity into Components:

$v_{horizontal} = v\cos(45^o) = 4.89$ m/s x $\cos(45^o) \approx 3.46$ m/s

$v_{vertical} = v\sin(45^o) = 4.89$ m/s x $\sin(45^o) \approx 3.46$ m/s

3. Impact Force for Navarro Ground Impact

Impulse-Momentum Theorem

$(F = \frac{m\Delta v}{\Delta t})$

where:

- F is the force
- $m$ is the mass of Navarro (75kg)
- $\Delta v_{vertical}$ is the change in velocity (from 3.46 m/s to 0 m/s for the vertical component)
- $\Delta t$ is the impact duration (0.2s)

Vertical Component of Impact Force

$$F_{vertical} = \frac{75kg \times 3.46\, m/s}{0.2s} = \frac{259.5\, kg\, m/s}{0.2s} = 1297.5 \text{ N}$$

4. Velocity of Impact for Lubey

- Fall height: 3 feet (0.91 meters)
- Acceleration due to gravity ($g$): 9.81 $m/s^2$

$$v = \sqrt{2 \times 9.81\, m / s^2 \times 0.91\, m} \approx \sqrt{17.85} \approx 4.22\, m / s$$

5. Decompose Velocity into Components

$v_{horizontal} = v \cos(45^o) = 4.22$ m/s x cos $(45^o) \approx 2.98$ m/s

$v_{vertical} = v \sin(45^o) = 4.22$ m/s x $\sin(45^o) \approx 2.98$ m/s

6. Impact for Lubey on Navarro

Impulse-Momentum Theorem

$(F = \frac{m\Delta v}{\Delta t})$

- F is the force
- $m$ is the mass of Lubey with 15 lbs of gear. (97.5kg)
- $\Delta v_{vertical}$ is the change in velocity (from 2.98 m/s to 0 m/s for the vertical component)
- $\Delta t$ is the impact duration (0.2s)

$$F_{vertical} = \frac{97.5kg \times 2.98\, m/s}{0.2s} = \frac{290.55\, kg\, m/s}{0.2s} = 1452.75 \text{ N}$$

7. Total Force Experienced by Navarro

$F_{total\ vertical}$ = 1297.5 N (Navarro Impact w/ Ground) + 1452.75 (Impact from Lubey) = **2750.25 N**

Conclusion:

Force from Navarro's Ground Impact (Vertical Component): **1297.5 N**

Force from Lubey's Impact on Navarro (Vertical Component): **1452.75 N**

Total Vertical Force Experienced by Navarro: **2750.25 N**

For comparison, a force of 1297.5 Newtons is roughly equivalent to the force of an amateur boxer's punch.[23]

This calculation was completed to demonstrate that the takedown of Navarro involved significant use of force rather than simply placing a person on the ground. As stated, this is a general estimate of the force using known values and accepted estimates.[24]

4. Despite being present, witnessing the incident, collecting BWC video evidence, and/or assisting in the arrest, no other police officers (except for Horton) completed a written report.

a. No SFPD officers on scene and who had information relevant to this incident were listed as witnesses in the SFPD Incident Reports written by Ofc. Lubey or Ofc. Horton despite an SFPD requirement to do so.[25]

b. No SFPD officer who was present or had information of probative value provided written statements (except for Ofc. Horton), nor did they file supplemental police reports on this incident.

c. Although there were numerous officers on the scene (six of whom had their BWCs capture some part of the incident) and there were numerous people in the area, there is not one witness to the shove that supposedly knocked a police officer off balance.

d. Navarro made no spontaneous statement of guilt, nor did make an admission that he willfully contacted Lubey. Additionally, he made no statements that would directly state, suggest, or imply he approached or contacted Lubey for anything more than a celebration.

---

[23] Mack J, Stojsih S, Sherman D, Dau N, Bir C. Amateur Boxer Biomechanics and Punch Force. *International Symposium on Biomechanics in Sports: Conference Proceedings Archive*. 2010;28:1-4.
[24] Özkaya, N., Leger, D., Goldsheyder, D., & Nordin, M. (2017). *Fundamentals of biomechanics equilibrium, motion, and deformation*. Springer International Publishing.
[25] CCSF-Navarro_000036-001244.pdf, CCSF-Navarro_000464

It was apparent Navarro was unhappy about what occurred, but he did not display hostility, anger, aggression, or violent behavior toward any of the officers on the scene.

While it is possible that Navarro tried to celebrate with Ofc. Horton, tried to shake hands with officers, yelled "Warriors" to police (the night they won the Championship), and then tried to celebrate with Ofc. Lubey, it is also possible Navarro suddenly committed an act of violence against a police officer without any "pre-assaultive" behaviors, any threats or hostile statements (before, during, or after the arrest), or any video that shows any acts of aggression towards police. While this is *possible*, it is not probable, and the evidence does not support this possibility.

e. After Navarro's arrest, a citizen contacted Ofc. Byrd as he stood near Navarro on the sidewalk.[26] The man apparently knew Navarro as he knew he was a teacher. When the man asked Ofc Byrd what happened, he replied, "You apparently saw everything, so why are you asking me what happened." Here, Ofc. Byrd believed or had information, that the unknown man saw everything that occurred between Ofc. Lubey and Navarro, yet he did not identify the man, didn't take his statement and instead told him to, "get out of my face and mind your business."

Rudely dismissing a potential witness of an alleged attack on a police officer is not acceptable investigatory practice. The fact no officer wrote a report corroborating Ofc. Lubey's claim he was pushed and Ofc Byrd dismissed a potential witness raises concerns.

5. Ofc. Lubey's use of force against Navarro was unreasonable, unnecessary, excessive, and inconsistent with SFPD Policy and Graham v. Conner.

a. Ofc. Lubey's use of force against Navarro was based on Lubey's assertion Navarro shoved him from an ambush position and did so willfully and in a harmful and offensive manner. However, there is no evidence to support this allegation; the evidence supports Navarro's position that he was celebrating and did not shove Lubey.

[26] Ofc. Byrd BWC, 05:35:46 – 05:36:40

b. Absent the unlawful shove, Ofc. Lubey had no cause to use force against or arrest Navarro. Any 148(a)(1) PC Interfering/Obstructing/Delaying suspicion was assessed and dismissed by Ofc. Horton. Navarro did interact with, made physical contact with, and likely irritated the officers with his celebratory actions, but Ofc. Horton must not have considered this a violation of that statute. Had Horton felt that violation occurred, he had the authority, ability, and available assistance to effect an arrest. Yet, Ofc. Horton moved around Navarro and continued to the man climbing the pole.

Inexplicably, Ofc Horton justified his use of force against Navarro (handcuffing) by writing in his official report, "the subject placed his hands on a police officer in a threatening manner." There is no other detail to further explain this statement. Ofc Horton did not witness Navarro put his hands on a police officer. He was facing away from Lubey at the time and wrote in his report, "As I turned around, Officer Lubey had Navarro on the ground, face down and was attempting to place him in handcuffs."[27]

Ofc Horton did not see Navarro place his hands on a police officer (other than himself), and if he did not see it, he couldn't with certainty know that it was done in a threatening manner. This is an important point as it suggests Horton simply supported Lubey without actually witnessing what he reportedly saw. This speaks to the credibility of Ofc Horton as he included this in his official police report, and without further explanation, it appears he did so to strengthen the case against Navarro.

Of additional concern, Sgt. Sheehan reviewed the Incident Reports, reviewed the BWC footage, and conducted the initial use of force evaluation.[28] Despite the inconsistencies, contradictions, lack of evidence, and witness statements, he approved the Incident Reports, completed the Supervisory Use of Force Evaluation, and found the force used was within department policy.

[27] Ofc Horton Incident Report, p. 2, para. 2. CSF-Navarro_000006
[28] CCSF-Navarro_00001-000035

c. SFPD General Order 5.01: II. Definitions (B) Immediate Threat - *An immediate threat is considered to exist if a suspect has demonstrated actions that would lead one to reasonably believe that the suspect will continue to pose a threat if not apprehended without delay. A person is an immediate threat if the officer reasonably believes the person has the present intent, means, opportunity, and ability to complete the threat, regardless of whether the threatened action has been initiated.*

Navarro demonstrated no actions that would suggest he was a threat that needed to be apprehended without delay. Lubey provided no evidence Navarro was a threat, nor did he describe Navarro as a threat apart from an unsupported allegation of a shove. Lubey had no information or indicators Navarro had the intent, means, opportunity, and ability to carry out a threat, and no threat was made or initiated[29]. A reasonable officer would not have concluded Navarro was an immediate threat since there were no factors from which to draw this conclusion. There is no evidence or suggestion Ofc. Horton was an *unreasonable* officer, yet he did not view Navarro as an immediate threat.

d. SFPD General Order 5.01: II. Definitions (E) Reasonable Force – *An objective standard viewed from the perspective of a reasonable officer, without the benefit of 20/20 hindsight, and based on the totality of the circumstances known to or perceived by the officer at the time*.[30]

The key issue here is that the standard is based on the *reasonable* officer. Ofc. Lubey knew he was dealing with a basketball fan who was celebrating and probably annoying. Lubey witnessed the interaction between Ofc. Horton and Navarro, and saw Horton move around him. Lubey didn't hear threats from Navarro, and none were alleged. Lubey didn't experience any hostility or aggression or describe Navarro as combative. Lubey didn't even report being insulted by Navarro. Yet, Lubey describes being shoved (hard enough to lose his balance), but no evidence supports this. There is no video evidence to support this claim.

[29] SFPD General Order 5.01 Immediate Threat, p. 2, Section II. Subsection B
[30] SFPD General Order 5.01 Use of Force, p. 3, Section II. Subsection E

There is no witness testimony to support this claim, and Navarro makes no statements to support this. He repeatedly denies having shoved Lubey.

Was Lubey a reasonable officer during that incident for the purposes of this policy? The lack of evidence to support Lubey's assertion he was shoved, despite the number of officers and bystanders nearby, is one factor to consider. Another would be accidental contact. Had there been some incidental contact between Lubey and Navarro (that wasn't significant enough to be seen in the video or witnessed by others), would it then be reasonable for a police officer to conclude it was done in a manner that was willful and harmful or in an offensive manner with no other information, as in this incident?

I would conclude a reasonable officer would not have truthfully alleged he was shoved hard enough to make him lose his balance but not hard enough to register the movement on his BWC. Additionally, I would conclude a reasonable officer would assess any incidental contact along with their current environment, any pre-contact behaviors demonstrated by the other party that might be threatening or hostile, and any pre-contact behaviors that might suggest revelry. Finally, I would conclude that a reasonable officer who didn't experience or observe these hostile behaviors would seek out the other person's motivation before forcefully throwing them to the ground and then landing on them.

e. SFPD General Order 5.01: III. Considerations Governing All Uses of Force (A) Use of Force Must be For a Lawful Purpose. - *Officers may use reasonable force options in the performance of their duties, in the following circumstances:*

*1. To effect a lawful arrest, detention, or search.*
*2. To overcome resistance or to prevent escape.*
*3. To prevent the commission of a public offense.*
*4. In defense of others or in self-defense.*
*5. To gain compliance with a lawful order.*
*6. To prevent a person from injuring himself/herself.*

Ofc. Lubey was an experienced SFPD officer who had used force in previous encounters. SFPD would have trained and educated him in the General Order outline above. There is no evidence to support Lubey's claim he was pushed, but there is video evidence to refute that assertion.[31] Given the weight of evidence to refute that a lawful arrest was warranted, Consideration #1 was not an appropriate circumstance for using force.

Consideration #2 was not an appropriate circumstance for using force in this case, as there is no allegation or evidence that Navarro resisted arrest or attempted to escape.

Consideration #3 was not an appropriate circumstance for using force in this case, as the evidence does not support that Navarro was in the commission of a public offense. Available evidence suggests Lubey's assertion that he was pushed did not occur, or if any contact occurred, it was incidental and more likely not done in a willful or harmful manner.

Consideration #4 was not an appropriate circumstance for using force as there was no immediate threat from which Lubey had to protect himself. Video evidence shows Navarro was not an immediate threat to Lubey, and Lubey's claim he was ambushed and shoved is without merit.

Consideration #5 was not an appropriate circumstance for using force as no lawful order was given by Lubey and refused by Navarro.

Consideration #6 was not an appropriate circumstance for using force as there was no allegation Navarro wanted to injure himself.

f. SFPD General Order 5.01: III. Considerations Governing All Uses of Force (B) Use of Force Evaluation - *The United States Supreme Court in Graham v. Connor (1989) 490 U.S. 386 held that an officer's use of force must be objectively reasonable under the totality of circumstances known to the officer at the time. This General Order builds upon the broad principles in Graham by adding additional upon which an officer's use of force shall be*

[31] This report, p. 11, subsection b, para. 2

*evaluated. This General Order is more restrictive than the constitutional standard and state law. Officers must strive to use the minimal amount of force necessary.*

The reasonableness standard in III. B. is discussed in Sub-section d. See above.

SFPD's General Order 5.0 lists 13 factors for evaluating the use of force. However, they also refer to factors not listed that might present an officer with the justification to use force.

In this incident, the *severity* of the crime (B2a) was misdemeanor Battery on a Police Officer. Lubey alleged he was shoved and taken off balance. He did not allege he was the victim of a sudden and violent blitz attack where he had to immediately defend himself from the ongoing blows of a superior opponent. Lubey said he was shoved but didn't even see who pushed him. Lubey didn't describe Navarro as continuing to attack him, moving towards him, or threatening him. Lubey wrote in his police report that he "immediately turned back to face Navarro and used a control hold/take down to force Navarro to the pavement." This official police report did not describe an ongoing attack or the threat of an ongoing attack—however, Ofc. Lubey wrote in his official police report that he needed to use force because the suspect's actions necessitated it due to the "threat presented by the subject. The subject assaulted me from within my blind spot in an ambush style."[32]

Navarro did not pose an *immediate threat to the safety of officers or others* as described in sub-section a. Available evidence does not support Lubey's allegation that he was ambushed and attacked, and neither Lubey nor Horton alleged he was a threat to any other officer or the public.

The absence of Navarro displaying threatening or hostile behaviors here cannot be ignored. Navarro did not pose a threat to Ofc. Horton or Ofc. Faubel. He was celebrating a basketball win, yelling, "Warriors," trying to shake hands with police, and probably annoying them

[32] SFPD Incident Report #220396174, p. 3, para. 11, CCSF-Navarro_000004

with his reveling. Lubey allegedly felt a shove without context and concluded it was willful, and harmful or offensive.

Although Navarro was arrested for 148(a)(1) PC - Resisting, Obstructing, or Delaying a Police Officer, the police report does not provide any information to justify that charge. Ofc. Lubey's contention that Navarro's momentary interaction with Ofc. Horton is sufficient to justify the charge is without merit. That Penal Code requires:

- Willfully resisting, delaying, or obstructing a peace officer
- in the discharge or attempt to discharge any duty of his or her office

Ofc. Lubey provided no evidence or information to show Navarro willfully resisted--he was taken to the ground and handcuffed. Ofc Fauhel later told Ofc Byrd, "Once he went on the ground he really did resist or anything."[33] Ofc. Lubey provided no evidence Navarro willfully delayed or obstructed a police officer. The short interaction with Ofc. Horton, after which Horton dismissed Navarro and walked away, did not rise to the level of a violation of this statute. This is apparent as Ofc. Horton took no enforcement action.

Neither Lubey nor Horton provided any evidence or information that they told Navarro they were attempting to discharge their duty by dealing with the man on the light pole. Navarro would have had no way of knowing he was interfering or delaying them unless they shared that information with him. Since Navarro didn't know the officers' status and there is significant evidence to support his contact was merely for celebration, this evaluation factor (SFPD General Order 5.01, III. B2c, Active Resistance) weighs in his favor.

Battery on a Police Officer is a serious thing when it occurs, but there is no evidence that Navarro battered, shoved, pushed, or ambushed Lubey. If there was contact between Lubey and Navarro, he provides no details or information in his police report or deposition to support that any contact was intentional. Lubey had the opportunity to include this

[33] Ofc Faubel BWC, 05:39:17

information but did not, despite knowing police reports are supposed to include all relevant facts and details. Without articulable facts to support the assertion that Navarro willfully shoved Lubey in a harmful or offensive manner; if there was physical contact, it is just as likely to have been incidental and not purposeful. This must be a possibility, as Lubey acknowledged that "anything is possible."[34]

Another factor (B2d) to consider is the *proportionality* of the threat. This report previously addressed the alleged threat Navarro posed to Lubey in detail, so I will refrain from repeating that information here. SFPD acknowledges that force is a dynamic condition that can and does change. In the context of using force, particularly within law enforcement, proportionality is a principle that dictates that the level of force applied in a situation should be appropriate to the threat presented and the objectives that need to be achieved.

In this case, Ofc. Lubey had allegedly been shoved. If this did occur, he did not fall. He was not injured, and he was not the victim of a continuing attack. Lubey did not even see Navarro shove him. Yet, he did not attempt to determine what happened. He did not give commands for Navarro to stop, get down, submit to arrest, or put his hands up. Lubey didn't attempt any verbal control or try to effect the arrest without using force.

If Lubey's account is viewed in the light most favorable to him and he was shoved, his response of forcing Navarro to the ground face-first onto a hard roadway and then landing on his back was not proportional to the threat *at the time he used force*. The threat Lubey alleges had already passed, and he presents no evidence or information to suggest the threat was still present. Ofc. Lubey's Incident Report[35] is confusing as he contradicts himself regarding the threat at the time of his use of force against Navarro.

Ofc. Lubey justifies his use of force because the subject assaulted him from within his blind spot.[29] He provides no detail, no indication, and no information that he was *being* assaulted when he used force. He did not describe Navarro coming at him, taking a fighting stance,

[34] Lubey Deposition, p. 74, line 14.
[35] SFPD Incident Report #220396174, p. 3, para. 11, CCSF-Navarro_000004

making threats, or any other action that would describe an active attack or assault. In his official Incident Report, Lubey described this moment by writing, "I immediately turned back to face Navarro and used a control hold/take down to force Navarro to the ground…"[36] However, Ofc. Lubey then contradicts himself ten paragraphs later when explaining why he didn't try and de-escalate by writing, "No efforts were made as the subject was actively assaulting me."[37] Either Lubey turned to face Navarro and took him down, or he was "actively" being assaulted and had to defend himself. The latter is unsupported by evidence and Lubey's own statements. Ofc. Lubey can certainly protect himself when attacked, but he cannot become the aggressor after the fact or try and even the score.

Ofc. Lubey explained why he didn't warn Navarro of the pending use of force by writing in his Incident Report, "No warning was possible due to the nature of the ambush attack."[38] The use of this language is curious as it is a clear exaggeration and does not accurately or objectively describe what occurred. Lubey's perspective that he was ambushed is not supported by the evidence, and it appears he used this to evoke a feeling of great danger and ensure his actions would be deemed justifiable.

Ofc. Lubey had *other feasible and less intrusive options* if his assertion that Navarro shoved him proved true. He could have used the nearby officers to compel Navarro to comply. He could have commanded Navarro to surrender or move to the ground through his own power. He could have used a control hold on Navarro alone or with another nearby officer. According to the video evidence and Lubey's own description of the incident, he had time to consider a less intrusive option, but he did not.

Ofc. Lubey's *tactical conduct and decisions preceding the use of force* are discussed extensively in previous sections of this report. This evaluation factor weighs in favor of Navarro as Lubey's decision-making and conduct were significantly flawed, or his statements misrepresented what actually happened on the scene.

---

[36] SFPD Incident Report #220396174, p. 3, para. 3, CCSF-Navarro_000004
[37] SFPD Incident Report #220396174, p. 4, para. 1, CCSF-Navarro_000004
[38] SFPD Incident Report #220396174, p. 4, para. 2, CCSF-Navarro_000004

Navarro's *mental health status, physical condition, developmental and cognitive disabilities, emotional issues, and alcohol impairment* were not discussed by Ofc. Lubey and he did not appear to factor these into his decision to use force. Since Ofc. Lubey did not attempt to discern what Navarro's intentions were or if he'd intentionally shoved him, and because Lubey does not reflect on this in his report, it appears he did not evaluate whether Navarro had the *ability to cease resistance or comply with his commands*.

Ofc. Lubey provided no information or evidence that he evaluated Navarro's *specialized knowledge, skills, or abilities* or if he had *prior contacts* with Navarro. Ofc. Lubey provided no evidence he considered the evaluation factors of *lighting, footing, sound conditions, crowds, traffic, or other factors.* The evaluation factors of *flight risk and escape* are discussed in previous sections.

**B. Ofc. Lubey arrested and booked Navarro for 148(a)(1) PC – Resisting, Obstructing, or Delaying a Peace Officer, knowing he did not violate that statute.**

a. Although Ofc. Lubey arrested Navarro under 148(a)(1) PC for Resisting, Obstructing, or Delaying a Police Officer, the police report fails to provide sufficient information to support this charge. Officer Lubey's assertion that Navarro's brief interaction with Officer Horton justifies the charge is unfounded. The relevant Penal Code stipulates:

- Willfully resisting, delaying, or obstructing a peace officer
- In the discharge or attempt to discharge any duty of his or her office

Officer Lubey did not present any evidence indicating that Navarro willfully resisted arrest; rather, Navarro was taken to the ground and handcuffed.

Additionally, Officer Lubey provided no proof that Navarro willfully delayed or obstructed a police officer. The brief interaction with Officer Horton, which ended with Horton dismissing

Navarro and walking away, does not constitute a violation of this statute. This is evident as Officer Horton could have but did not take any enforcement action.

Neither Officer Lubey nor Officer Horton provided evidence or information indicating that they informed Navarro they were attempting to discharge their duty. Without this information, Navarro could not have known he was interfering or delaying them; there were many officers in the area because of the Warrior's win. Without notice, a warning, or advisement of their status, it is not surprising Navarro was unaware of the officers' status, and attempting to shake their hands is insufficient for this charge.

b. If Navarro's attempting to shake the hands of officers was not the basis for the resisting arrest charge, and it was the physical arrest he allegedly resisted, this is not documented in either Lubey's or Horton's report. Furthermore, Ofc Faubel told Ofc. Byrd, "Once he went on the ground he really didn't resist or anything."[39] Given this statement by Ofc Faubel and the lack of resisting arrest elements included in either of the reports, this cannot be the basis for the charge.

Horton did write that Navarro approached him in the crosswalk and "grabbed" him while yelling "Warriors."[40] While Navarro's actions were likely annoying and improper, Horton provides no evidence he warned Navarro he was interfering with his official duties; he pushed Navarro away and continued walking. Horton had the physical ability to arrest Navarro had he concluded Navarro violated 148(a)(1) PC, but he did not do this. He kept walking. This does not fit the elements for 148(a)(1) PC, and it is unlikely this was the basis for the charge.

Without evidence or supporting statements by Lubey or Horton on how Navarro violated 148(a)(1) PC, Ofc Laubey used force against, injured, arrested, booked, and sought charges against Navarro for a crime he knew he did not commit.

[39] Ofc. Faubel BWC, 05:39:16
[40] Horton Incident Report #220396174, p. 1, para. 3. CCSF-Navarro_000006

## VIII. Conclusions

a. Officer Lubey's use of force was unreasonable, unnecessary, and excessive. Ofc. Lubey failed to adequately consider all facts available to him and required by the San Francisco Police Department before using force against Navarro. These failures were part of Lubey's decision-making, as was his assertion that Navarro shoved him in a willful, harmful, or offensive manner. Evidence disproves Lubey's contention he was shoved (battered), and there were no witnesses to corroborate this. This "attack" was the primary justification Lubey used to forcefully take Navarro to the ground. There is no evidence Navarro was a threat to Lubey before the arrest and use of force, but there is evidence Navarro was part of a misguided basketball celebration. There was no evidence that Navarro was a threat sufficient to justify Lubey's takedown when it occurred. Still, there is evidence that Lubey failed to consider required SFPD force decision factors. Finally, available evidence contradicts Lubey's assertion he "placed" Navarro on the ground and supports Navarro received a significant amount of impact force sufficient to cause injury.

b. Ofc. Lubey arrested and booked Navarro for 148(a)(1) PC – Resisting, Obstructing, or Delaying a Peace Officer, knowing he did not violate that statute. Ofc. Lubey's official report does not include elements to support an allegation that Navarro resisted, obstructed, or delayed police officers in their official duties. Ofc. Horton assessed Navarro's actions and did not take enforcement action; he walked around him and continued across the intersection. The environment and social context were one of celebration and revelry, and Horton likely factored this into his decision-making. Navarro did not know the officers were carrying out their official duties and was not advised or warned of this. Attempting to shake hands, high-five, share a celebratory shout, or talk to police officers is insufficient to warrant a charge of 148(a)(1), and Lubey knew this. The 148(a)(1) was not the result of him resisting the physical arrest as there is evidence to counter such a claim, and Ofc. Faubel stated that Navarro didn't resist arrest.

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness, would testify competently thereto. I reserve the right to modify my opinions if new information is

provided. Furthermore, I reserve the right to utilize exhibits, demonstrative or otherwise, to help communicate concepts and my findings to the jury at the time of trial.

Dated: June 6, 2024



____________________

Dr. Glen Andrew Haas

# EXHIBIT 4

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ANTHONY CASTEL NAVARRO, INDIVIDUALLY,

PLAINTIFF,

VS. NO.: 3:23-CV-02402-SK

CITY AND COUNTY OF SAN FRANCISCO; OFFICER JEFFREY LUBEY, IN HIS INDIVIDUAL CAPACITY AS A LAW ENFORCEMENT OFFICER FOR THE SAN FRANCISCO POLICE DEPARTMENT; AND DOES 1-50, INCLUSIVE,

DEFENDANTS.

VIDEOTAPED DEPOSITION OF OFFICER JACOB HORTON

Friday, June 7, 2024, 9:59 a.m.

Held Remotely Via Videoconference

Stenographically Reported by

Jennifer Smith, CSR No. 13577

Job No. 300211

City of San Francisco. 10:01:05

THE VIDEOGRAPHER: Would the court reporter please swear in the witness. 10:01:06 10:01:20

OFFICER JACOB HORTON,

having been first duly sworn, testifies as follows:

EXAMINATION

BY MR. MONROE:

Q Good morning, Officer Horton. 10:01:24

A Good morning. 10:01:26

Q Can you state and spell your full name for the record, please. 10:01:27 10:01:29

A Jacob Horton, J-a-c-o-b H-o-r-t-o-n. 10:01:29

Q Officer Horton, have you ever given a deposition before? 10:01:33 10:01:35

A This is my first one. 10:01:36

Q Okay. Have you ever testified in court before? 10:01:37 10:01:38

A I've done prelims. Yes. 10:01:39

Q Okay. So some of the same rules and guidelines that you follow when you take the stand in a preliminary hearing are going to be similar to the ones that we have here, so I am going to go over a few of them. 10:01:41 10:01:45 10:01:48 10:01:52 10:01:54

sorry. 10:18:59
BY MR. MONROE: 10:18:59
Q Did you feel that you were under attack when Mr. Navarro grabbed you? 10:19:00 10:19:02
A No. But my concern was also with the guy on the light pole, so . . . 10:19:04 10:19:06
Q Okay. Did you feel that you were in danger when Mr. Navarro grabbed you? 10:19:08 10:19:11
A No. 10:19:12
Q Did you feel that Mr. Navarro was a threat when Mr. Navarro grabbed you? 10:19:13 10:19:17
MS. LI: Objection. Calls for a legal opinion. Argumentative. Misleading. 10:19:19 10:19:22
You can answer. 10:19:25
THE WITNESS: Okay. Did I feel like he was a threat? 10:19:26 10:19:30
BY MR. MONROE: 10:19:31
Q Right. 10:19:31
A Was that your question? 10:19:32
Q Yeah. 10:19:34
Did you feel like he was a threat to you, to your safety and well-being, when he grabbed you? 10:19:34 10:19:36
A Well, yeah. So I kind of moved him off to the side. 10:19:40 10:19:42
Q Okay. And after you moved him to the side, 10:19:43

Q Were you still concerned about where Mr. Navarro was after moving him to the side? 10:20:34 10:20:36
A No. My concern was the individual on the light pole. 10:20:39 10:20:41
Q Okay. So you weren't concerned about where Mr. Navarro was, but you still perceived him as a threat; correct? 10:20:42 10:20:46 10:20:50
A Well, he came up and grabbed me, so yes. 10:20:51
Q Okay. Do you typically walk away from individuals who you perceive are a threat to your safety? 10:20:54 10:20:57 10:21:00
A Not necessarily, no. 10:21:00
Q Okay. So what made you walk away from Mr. Navarro if you perceived him as a threat that night? 10:21:01 10:21:03 10:21:06
A I just felt he was going to continue walking. I didn't . . . 10:21:07 10:21:09
Q So by continuing walking, would you still consider Mr. Navarro a threat? 10:21:14 10:21:16
A If he would have walked away, no. 10:21:17
Q No. You said that -- 10:21:19
The question was: Why didn't you perceive Mr. Navarro as a threat that night when you were walking away? 10:21:21 10:21:25 10:21:28
You answered that he thought he was going 10:21:29

THE WITNESS: What was the question again? I'm sorry. 10:22:13 10:22:15
BY MR. MONROE: 10:22:15
Q Did you feel as if Mr. Navarro was going to ambush you when he grabbed you? 10:22:16 10:22:19
A No. 10:22:23
Q Okay. Did you feel as if Mr. Navarro was going to ambush you when you pushed him -- sorry -- when you moved him to the side and began walking toward the light poles? 10:22:24 10:22:27 10:22:33 10:22:36
A No. 10:22:38
Q Do you remember writing in your report that Mr. Navarro yelled out "Warriors" to you when he grabbed you? 10:22:39 10:22:42 10:22:46
A I would have to look at my report. 10:22:47
Q Okay. Would that refresh your recollection? 10:22:50 10:22:51
A Yes. 10:22:52
Q Okay. Do you have the report there with you? If not, I can put it on the screen. 10:22:52 10:22:55
A No. 10:22:58
Q Okay. Give me one second. 10:22:59
Officer Horton, are you able to see my screen at this time? 10:23:25 10:23:29
A I am. 10:23:30

STATE OF CALIFORNIA )
) ss:
COUNTY OF LOS ANGELES )

I, JENNIFER SMITH, do hereby certify:

That I am a duly qualified Certified Shorthand Reporter in and for the State of California, holder of certificate number 13577, which is in full force and effect, and that I am authorized to administer oaths and affirmations;

That the foregoing deposition testimony of the herein named witness was taken before me at the time and place herein set forth;

That prior to being examined, the witness named in the foregoing deposition was duly sworn or affirmed by me to testify the truth, the whole truth, and nothing but the truth;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me, and were thereafter transcribed under my direction and supervision;

That the foregoing pages contain a full, true, and accurate record of the proceedings and testimony to the best of my skill and ability.

I further certify that I am not a relative

or employee or attorney or counsel of any parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the outcome of this action.

IN WITNESS WHEREOF, I have subscribed my name on this date:

Jennifer Smith, CSR No. 13577