DAVID CHIU, State Bar #189542
City Attorney
JENNIFER E. CHOI, State Bar #184058
Chief Trial Deputy
JOSE A. ZELIDON-ZEPEDA, State Bar #227108
LISA E. GIARRATANO, State Bar #346002
KATHERINE B. BEARMAN, State Bar #280561
Deputy City Attorneys
Fox Plaza
1390 Market Street, Sixth Floor
San Francisco, California 94102-5408
Telephone: (415) 355-3312 [Zelidon-Zepeda]
Telephone: (415) 554-3813 [Giarratano]
Telephone: (415) 554-4256 [Bearman]
Facsimile: (415) 554-3837
E-Mail: jose.zelidon-zepeda@sfcityatty.org
E-Mail: lisa.giarratano@sfcityatty.org
E-Mail: kate.bearman@sfcityatty.org

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO
AND JEFFREY LUBEY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY CASTEL NAVARRO, AN INDIVIDUAL,<br><br>Plaintiff,<br><br>vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO; OFFICER JEFFREY LUBEY, IN HIS INDIVIDUAL CAPACITY AS A LAW ENFORCEMENT OFFICER FOR THE SAN FRANCISCO POLICE DEPARTMENT; AND DOES 1-50, INCLUSIVE,<br><br>Defendants. | Case No. 23-cv-02402 SK (PHK)<br><br>**DECLARATION OF JOSE A. ZELIDON-ZEPEDA SUPPORTING OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 1 TO EXCLUDE DEFENDANTS' EXPERT RACHEL DEMPSEY'S UNDISCLOSED REPORT**<br><br>Trial Date: November 17, 2026 |

I, Jose A. Zelidon-Zepeda, declare as follows:

1. I am an attorney admitted to practice law in the State of California and before this Court. I am employed as a Deputy City Attorney with the San Francisco City Attorney's Office, and I am counsel for Defendants City and County of San Francisco and Jeffrey Lubey ("Defendants") in the above-captioned case. As counsel for Defendants, I have personal knowledge of the facts set forth in this declaration except for those matters based on information and belief. As to those matters, I believe them to be true. I am competent to testify to the facts set forth in this declaration, and, if called, would so testify. I submit this Declaration in Support of Defendants' Opposition to Plaintiff's Motion in Limine Number 1.

2. Attached as Exhibit A is a true copy of the Rule 35 Independent Medical Examination prepared by Dr. Rachyll Dempsey in this case.

3. Attached as Exhibit B is a true copy of the Rebuttal Report prepared by Dr. Rachyll Dempsey in this case.

4. Attached as Exhibit C is a true copy of the Expert Report prepared by Plaintiff's retained expert, Dr. Natalie Jones, in this case.

5. After Plaintiff disclosed a psychological expert report, Defendants retained Dr. Dempsey as a rebuttal expert.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on this 25th day of September 2026 in San Francisco, California.

*/s/ Jose A. Zelidon-Zepeda*

JOSE A. ZELIDON-ZEPEDA
Deputy City Attorney

# EXHIBIT A

PSYCHOLOGICAL ASSESSMENT, INC.

**R. Dempsey, PsyD, QME, ABPP**

Forensic Neuropsychologist

Board Certified Forensic Psychologist

CA: PSY21261; NV: PSY 1078; AK: 193651; PSYPACT TAP 19053

# Independent Medical Evaluation

**NAME:** Anthony Navarro

**DOB:** 11/17/80

**Re:** *Anthony Castel Navarro v CCSF, et.al*

United States District Court: Case No. 23-cv-02402 SK

**Date of Evaluation**: 7/24/24

**Date of Report:** 8/14/24

**Place of Testing:** 385 Grand Street, Oakland, CA

**Identifying Information & Reason for Referral**

Mr. Navarro is a 43-year-old Filipino male who currently resides in Vietnam. He was referred for psychological testing by Lucia Li, Deputy City Attorney; San Francisco City Attorney's office for an Independent Medical Exam (IME) pursuant to Civil Procedure Rule 35.

On 6/1/22 Mr. Navarro was arrested in San Francisco for Battery of a Peace Officer and Resisting Arrest. He is claiming that he was assaulted by Officer Lubey in the exchange.

**Consent**

Mr. Navarro was informed as to the nature and purpose of the testing, the evaluator's duties as a mandated reporter, was informed that the results would be summarized in a report that would be submitted to court officials, and as such, limited confidentiality was expected in this evaluation. Mr. Navarro indicated that he understood the limits of confidentiality and agreed to cooperate under these conditions. Effective communication was not an issue with Mr. Navarro as he is fluent in English.

**Procedures / Sources of Information**

In addition to a two-hour clinical interview, the following assessment tools were utilized, records reviewed:

*Tests Administered*

- Minnesota Multiphasic Personality Inventory, 3rd ed. (MMPI-3)
- Morel Emotional Numbing Test (MENT)
- Millon Clinical Multiaxial Inventory, 4th ed. (MCMI-4)
- Adverse Childhood Experiences Questionnaire for Adults (ACEQ)

*Records Reviewed:*

- Kaiser records, dated between 4/9/21 and 6/27/22
- Report prepared by Natalie Jones, PsyD, LPCC, dated 6/6/24
- Addendum prepared by Natalie Jones, PsyD, LPCC, dated 6/28/24
- Deposition of Anthony Navarro, dated 2/20/24

- Miscellaneous court records
- Miscellaneous administrative records
- Miscellaneous emails, texts, and pictures

The following assessment is based on available information. Special consideration with regard to ethnicity, socioeconomic influences, gender, sexual orientation, and other cultural contexts have been made. With additional information, opinions expressed herein may change.

**Incident as Related by Mr. Navarro**

"I got attacked by Officer Lubey."

Mr. Navarro explained that after having recovered from two weeks of having the COVID-19 virus, that on 6/16/22 he went out with his family to celebrate their favorite basketball team winning and feeling healthy. He explained he had forgotten his credit card at a restaurant and doubled back to retrieve it. As he was returning to rejoin his family he was "showing love" to strangers and high-fiving them when he put his hand out to do the same with Officer Lubey. Mr. Navarro explained that he thought that he had said "go Warriors" to the officer when Officer Lubey slammed him to the ground and "scraped my face in the concrete." He explained that he did not know what was going on, but suddenly "five or six officers were on my back." Mr. Navarro explained that he was lifted up twice by his arms and stated. "I don't know why he did that." He stated that he was celebrating and "I don't know why he attacked me. I didn't do anything to provoke him." He stated that he was arrested for "battery of a police officer and resisting arrest" and incarcerated for an hour. Mr. Navarro explained that he was in contact with the district attorney's office and the charges were dropped.

Kaiser records substantiate that on 6/17/22 Mr. Navarro was treated for abrasions to his face, right knee pain and bruise, and sore shoulders due to alleged assault by police.

**Background Information**

Mr. Navarro reported that he was born in San Diego, California, and raised there with two sisters (one older and one younger), one older brother, and both parents. Mr. Navarro reported that his mother told him he was born on time "really fast" with an easy labor and he met his developmental milestones on time. He explained that when he was 18 years of age, his parents divorced he and his mother relocated to San Francisco, California. He has not had contact with his father since the move.

Mr. Navarro described his childhood as "fun" that included sports, hip-hop, and "a lot of beautiful things." He also explained that his "normal" included a number of violent events. He admitted to physical and verbal abuse from his father through his childhood. It should be noted that in Dr. Jones' report, Mr. Navarro described witnessing severe domestic violence between his parents. He told Dr. Jones that his father was frequently incarcerated for domestic violence toward his mother and that their divorce was prompted by an incident of domestic violence where his father assaulted and threatened his mother. He explained that he grew up in a "working-class community" that had gangs and violence around his neighborhood. He denied ever joining a gang but admitted to fighting through

his childhood. He admitted to seeing one of his close friends getting "beat with a lead pipe" so badly that he was in a coma. He told the story of another friend being stabbed and killed.

Mr. Navarro reported that he completed high school but was "never inspired by the educational system" until he relocated to the San Francisco Bay Area and started college. He explained that he visited family in the Philippines and was inspired to return and attend college in order to become an educator and send money to his family in the Philippines and also "give back to the community and society." Mr. Navarro reported that he attained his bachelor's degree in ethnic studies, a master's degree in education, and teaching credential in social science. He denied special education, learning disability, or behavioral problems in school.

Mr. Navarro reported that he is married and has an infant child. He reported one previous divorce but denied that it affected him because he and his ex-wife "had different paths" but that she is still a good friend. Mr. Navarro reported having a "positive" support system that includes several close friends, his family, and his wife. He reported that his hobbies include making music and being a disc jockey (DJ). He explained that "music has been an outlet for me since I was young and is a positive coping and creativity." He also reported that since he was young, he enjoyed sports but does not engage in group sports as often now since the incident, so he chooses more solo activities like running and swimming.

Mr. Navarro explained that prior to the incident he and his family had tickets to go to the Philippines and Vietnam for vacation. He explained that he has been back to the United States (U.S.) twice – once for the settlement conference and the next for this assessment. Mr. Navarro explained that he does not want to be in the U.S. because he does not feel comfortable in this country, no longer trusts law enforcement, and he would prefer to be at home with his wife and new baby. He described Vietnam as more peaceful.

Mr. Navarro denied any previous criminal legal history.

**Employment History**
Mr. Navarro reported a history of stable employment significant for teaching. He reported that his first teaching assignment was when he was a Child Care Teacher (K through 5th grade) for five years between 2000 and 2006 and left that position to become an advocate and youth mentor at the Filipino Youth Center. He reported that he worked for middle school and high school out of school youth for about eight years. Mr. Navarro reported that in approximately 2011 he started getting his teaching credential and began working in high school.

Mr. Navarro reported that since August 2022 he has resided in Vietnam and at first he taught English but now he works remotely part-time for a San Francisco community organization that he used to volunteer with. He also reported that he sometimes DJ's.

**Medical and Substance Use History**

Mr. Navarro's medical history is remarkable for relative health throughout his life, and he denied any illnesses or surgeries. He denied any history of head injury and explained that he had two major injuries – the first was the subject incident noted above and the second was in May 2024 when he was in a motorcycle accident.

Mr. Navarro reported that he was in a motorcycle accident on 5/22/24 and was anxious (about the evaluation with Dr. Jones and a death of a friend), which resulted in him being so distracted that he ran into a car and "flew and landed on [his] shoulder." He explained that he dislocated his shoulder and went to the hospital and was diagnosed with a "grade three [out of six]" dislocation, which is in between needing surgery. He explained that he does not have the money for formal physical therapy but is doing what he can from what he has learned online, but caring for a newborn child has been taxing on his injury. Mr. Navarro described his shoulder pain is a "7" on any given day. With regard to sleep, he admitted that his history of sleep has varied, but recently has been disrupted by having a baby in the house. Mr. Navarro denied any current medication regimen

Mr. Navarro's substance use history is characterized by social alcohol and cannabis use. He reported that he "partied" a lot more when he was 20 years of age but ceased consuming alcohol the first time he vomited. He explained that since the incident he has rarely consumed alcohol. He reported that he used cannabis "once a month or once every two months" prior to the incident. He explained he does not use cannabis in Vietnam because it is illegal. He denied use or abuse of any other drugs including over-the-counter or prescription drugs.

**Mental Health History**

Mr. Navarro's mental health history includes therapy starting in 2021. He explained that he resided in the Philippines between 2015 and 2021, where he taught in indigenous communities. He explained that he experienced "a lot of trauma" there that included witnessing Indigenous people trying to protect their land from environmental logging and mining companies, several suicides from the students he was teaching, as well as paramilitary violence. Mr. Navarro described a paramilitary attack at the school where he was teaching which resulted in him having to flee. He explained that several of his friends, other teachers, and community leaders were killed and so he had to leave the country out of fear for his life. He stated after that "a lot of trauma came out" and he began seeing a somatic therapist who he claimed diagnosed him with Post Traumatic Stress Disorder (PTSD). Please note, no records were received from this practitioner. Mr. Navarro stated that "there was heaviness in me" and he started seeing the somatic therapist because he knew his mental health was impacting his teaching.

Mr. Navarro explained that he started teaching again in the U.S. initially remotely but then back in the classroom where students were acting out following the *Shelter in Place* initiative. He explained that he witnessed substance abuse from his students, violence/fighting, and there was a suicide prevention discussion at the school in which he "broke down" prompting him to go on leave. As with the discussion with Dr. Jones, Mr. Navarro explained that the workshop triggered his memories of the loss of his students in the Philippines. This was confirmed in a note from Kaiser dated 3/8/22 where Mr. Navarro called for counseling and admitted to witnessing murders in the Philippines and had broken

down publicly at school. He admitted to "panic attacks" and suicidal ideation. At that time, Mr. Navarro was diagnosed with Post Traumatic Stress Disorder and taken off work 3/8/22 to 3/21/22. Notes include exchanged emails with his doctor extending his leave for a variety of reasons. Notes also indicate that he reported attending a six-week trauma recovery group, but actual attendance could not be verified.

Mr. Navarro reported that he has had some periods of depression that lasted for only a day at a time. He denied any history of psychosis. He reported suicidal ideation but no history of attempts or plans, citing his new child as one of the main things in his life worth living for.

Mr. Navarro reported that he has had feelings of anxiety through his life which increased through 2022 that included "breakdowns at my job" and "panic attacks" that included becoming triggered and having to excuse himself to the restroom to "compose" himself. He admitted that the episodes lasted varying amounts of time, but he often found himself overcome with emotion and crying prior to this incident. He explained that he was making progress with his therapy. However, since the incident he has had an increase in anxiety, and his symptoms "all came back" and became worse. He explained that he has more peace of mind in Vietnam and does not feel like he is on guard, but others who do not know about his history tell him that he is "always watching my back."

Mr. Navarro explained that his symptoms of PTSD include "paranoia, overthinking, paralysis analysis, panic attacks, heart racing, feeling jittery, sometimes not feeling safe." He also reported that he has "survivor's guilt" (from his time in the Philippines). He explained that he is trying to learn and grow from the trauma and not focus on the negative.

Mr. Navarro explained that he cannot afford therapy and so he is not currently in therapy and has had no treatment since the subject incident.

**Behavioral Observations/Mental Status**

Mr. Navarro is a 48-year-old, right-handed, Filipino male who was well-groomed, clean-shaven, wearing weather-appropriate clothing. He denied assistant devices. He appeared his stated chronological age and was a self-reported height of 5'8" and weight of 165 pounds, explaining that he recently lost a lot of weight due to lack of sleep because of his baby.

Mr. Navarro's speech was clear and somewhat soft-spoken. He walked with a smooth gait and maintained good eye contact. His thought process was linear and future-oriented with attainable plans to be with his family and "grow from a positive way." Indeed, notably through the interview after he described a traumatic event, he would soften the memory with statements such as "but there were many beautiful things (about his childhood) too." His affect was blunted, and he reported his mood was "anxious." Of note, this evaluator had an assistant at the beginning of the assessment and Mr. Navarro expressed concern about having two people in the room with him (therefore the assistant was asked to leave).

Mr. Navarro was alert and oriented to person, place, day, and date. His immediate memory was average evidenced by his ability to recall three words spontaneously without cuing. His concentration was average evidenced by his ability to complete the serial seven's exercise (counting backward from 100 by 7's). Mr. Navarro appeared to benefit from encouragement, gave good effort, and complied with all tasks requested, therefore scores should be considered a good measure of his current functioning.

**Test Results/Clinical Interpretations**

Mr. Navarro was administered three tests to assess personality and mental health symptoms. The Morel Emotional Numbing Test, 5th ed. (MENT) is a psychometric test that provides empirically grounded probabilistic evidence to aid professionals in making sound clinical or forensic opinions regarding the veracity of symptom presentation specifically related to post-traumatic stress. The MENT is used in many countries and has normative data derived from real world settings in known-group study designs.

The Millon Clinical Mulitaxial Inventory, 4th ed. (MCMI-IV) is a 195 forced choice (true/false) measure that evaluates an individual across multiple domains including clinical and preferred personality patterns and clinical syndromes. The MCMI-IV also includes validity scales that evaluate an individual's tendency to over or underreport symptoms or try to present themselves in an overly favorable light.

The Minnesota Multiphasic Personality Inventory, 3rd ed. (MMPI-3) is a 335-item forced choice (true/false) measure that evaluates functioning in a variety of domains. The MMPI is one of the most widely used tests for evaluating personality functioning. It is also utilized because of the validity indicators which help to identify if an individual is over or under-reporting symptoms, trying to present themselves in a favorable light, or randomly responding to the test.

The Adverse Childhood Experiences Questionnaire (ACEQ) for adults assesses childhood exposure to traumatic events in order to better guide practitioners in assessment and treatment. The screening version is derived of 10 questions specific to various abuse, neglect, and trauma.

**Symptom Validity:** Three tests were utilized to assess the veracity of Mr. Navarro's reported mental health symptoms. Mr. Navarro's score on the MENT is considered in the Within Normal Limits range, suggesting that he was not exaggerating symptoms of PTSD. The validity scales on the MCMI-IV were average, indicating that the protocol was valid. However, validity scales on Mr. Navarro's MMPI-3 scores suggested that he provided an unusual combination of response associated with somatic and cognitive symptoms which may be indicative of a tendency to somaticize stress and is relevant to his most recent shoulder injury which is likely contributing to a perceived magnification of symptoms. Further, validity scores on his MMPI-3 suggest that he tends to under-report faults and personal shortcomings that most people acknowledge. This may be cultural as it is sometimes seen in families with more traditional tendencies. Overall, with the exception of the tendency to over-endorse somatic complaints, Mr. Navarro's three tests are considered to be good measures of current functioning. Specifically, Mr. Navarro has a tendency to unconsciously magnify and focus on physical

maladies and transform psychological stressors into medical complaints. It should be noted that this can also be considered cultural.

**Personality Functioning:** The ACEQ, MCMI-IV, and MMPI-3 were utilized to assess personality functioning. The MMPI-IV and MCMI-3 were similar in most respects. Both indicate that Mr. Navarro is an introversive and passive individual who is likely socially inhibited. He is likely someone who holds emotions in and is not emotionally expressive. His profile is similar to others who are quick to blame themselves, experience low self-esteem and self-doubt. Additionally, the MMPI-3 suggests that Mr. Navarro may see himself as disciplined with a good work ethic, tending to minimize leisure activities.

Both measures also highlight Mr. Navarro's preoccupation with physiological symptoms that he perceives as interfering with his life. Additionally, both outline that Mr. Navarro expressed negativity and excessive worry, as well as complaints about finances and stress. Finally, both measures were consistent with Mr. Navarro's endorsement of experiences of traumatic events that have resulted in avoidance, anxiety when exposed to cues, sleep disturbance, and hypervigilance. Further, they both highlight a tendency toward persecutory ideation, including suspiciousness of others. The ACEQ was scored at 70%, suggesting that Mr. Navarro experienced many traumatic events in childhood, which is consistent with his self-report.

**Diagnostic Impressions:**

The following diagnostic impressions are informed by the Diagnostic and Statistical Manual, 5th ed. (DSM-5).

- F43.10 Posttraumatic Stress Disorder, chronic

A. Exposure to actual or threatened death, serious injury, or sexual violence in one (or more) of the following ways:

**1. Directly experiencing the traumatic event(s).**
**2. Witnessing, in person, the event(s) as it occurred to others.**
3. Learning that the traumatic event(s) occurred to a close family member or close friend. In cases of actual or threatened death of a family member or friend, the event(s) must have been violent or accidental.
4. Experiencing repeated or extreme exposure to aversive details of the traumatic event(s).

B. Presence of one (or more) of the following intrusion symptoms associated with the traumatic event(s), beginning after the traumatic event(s) occurred:

1. Recurrent, involuntary, and intrusive distressing memories of the traumatic event(s).
2. Recurrent distressing dreams in which the content and/or affect of the dream are related to the traumatic event(s).
**3. Dissociative reactions (e.g., flashbacks) in which the individual feels or acts as if the traumatic event(s) were recurring. (Such reactions may occur on a continuum, with the most extreme expression being a complete loss of awareness of present surroundings.)**
**4. Intense or prolonged psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event(s).**

5. Marked physiological reactions to internal or external cues that symbolize or resemble an aspect of the traumatic event(s).

C. Persistent avoidance of stimuli associated with the traumatic event(s), beginning after the traumatic event(s) occurred, as evidenced by one or both of the following:

1. Avoidance of or efforts to avoid distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s).
**2. Avoidance of or efforts to avoid external reminders (people, places, conversations, activities, objects, situations) that arouse distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s).**

D. Negative alterations in cognitions and mood associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:

1. Inability to remember an important aspect of the traumatic event(s) (typically due to dissociative amnesia and not to other factors such as head injury, alcohol, or drugs).
**2. Persistent and exaggerated negative beliefs or expectations about oneself, others, or the world (e.g., "I am bad," "No one can be trusted," "The world is completely dangerous," "My whole nervous system is permanently ruined").**
**3. Persistent, distorted cognitions about the cause or consequences of the traumatic event(s) that lead the individual to blame himself/herself or others.**
**4. Persistent negative emotional state (e.g., fear, horror, anger, guilt, or shame).**
5. Markedly diminished interest or participation in significant activities.
6. Feelings of detachment or estrangement from others.
7. Persistent inability to experience positive emotions (e.g., inability to experience happiness, satisfaction, or loving feelings).

E. Marked alterations in arousal and reactivity associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:

1. Irritable behavior and angry outbursts (with little or no provocation) typically expressed as verbal or physical aggression toward people or objects.
2. Reckless or self-destructive behavior.
**3. Hypervigilance.**
**4. Exaggerated startle response.**
5. Problems with concentration.
6. Sleep disturbance (e.g., difficulty falling or staying asleep or restless sleep).

F. Duration of the disturbance (Criteria B, C, D, and E) is more than 1 month.
G. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.
H. The disturbance is not attributable to the physiological effects of a substance (e.g., medication, alcohol) or another medical condition.

**Conclusions:**

Mr. Navarro is a 43-year-old Filipino male who currently resides in Vietnam with his wife and infant child. He was referred for psychological testing by Lucia Li, Deputy City Attorney; San Francisco City Attorney's office for an Independent Medical Exam (IME) pursuant to Civil Procedure Rule 35. Mr. Navarro is claiming that he was assaulted by Officer Lubey.

Mr. Navarro reported that he was born in San Diego and relocated to the San Francisco Bay Area at 18 years of age. He went on to earn a graduate degree and teaching credential so that he could send money home to his family in the Philippines and "give back" to his community. Mr. Navarro described being involved in many community organizations and an employment history significant for teaching and working with youth. He is married with an infant and described a strong support system.

Mr. Navarro's history is significant for childhood abuse and trauma resulting from physical, emotional, and verbal abuse from his father, witnessing domestic violence in the home, witnessing a friend beaten into a coma, experiencing community violence, and being exposed to death of friends. In adulthood, he spent five years in the least developed country (LDC) of the Philippines where he witnessed community violence and lived under a constant state of fear brought on by paramilitary who he reported ultimately entered the school he was teaching and murdered several teachers, resulting in him having to flee the country. Despite having an incredibly traumatic history, Mr. Navarro maintained that he seeks growth and tries to find positive things to focus on, such as his music which developed out of the environment he was raised in.

Mr. Navarro admitted that he first sought mental health treatment in 2020 when he returned from the Philippines because his mental health symptoms were interfering with his ability to teach. He admitted that his symptoms increased when in 2021 he returned to teaching in person and by 2022 his symptoms of PTSD were so pronounced that he was placed on medical leave by his primary care physician and started attending group therapy for trauma in addition to seeing a psychologist. Mr. Navarro described his symptoms as including "panic attacks" that appear to be more in keeping with anxiety attacks brought on by intrusive memories (i.e. not meeting criteria for a Panic Disorder). He further admitted to increased fear, emotionality, and avoidance behavior.

Mr. Navarro described how he and his mother left San Diego when his parents divorced when he was 18 years of age and how he left the Philippines afraid for his life. After the subject incident, Mr. Navarro also took his leave from the United States to relocate his family to Vietnam. This tendency to leave an environment that reminds one of a traumatic event(s) is common for individuals with PTSD and Mr. Navarro's avoidance behavior is consistent pre- and post-incident.

Test results indicate that Mr. Navarro is a more introverted individual who has a good work ethic, and likely a tendency to somaticize illness. He was recently (May 2024) involved in a serious motorcycle accident that has affected his shoulder and he has not been able to attain proper medical treatment which could account for many of his elevations on testing related to the above-mentioned somatization tendency. In essence, his various stressors are more likely to be unconsciously channeled into his shoulder injury and recovery. However, his tests also illustrate that he has many symptoms in common with PTSD including avoidance behavior, ruminations, intrusive thoughts of traumatic events, and fear responses. These were pre-existing symptoms which the May 2024 incident contributed to.

Therefore, based on all available information and supported by testing, Mr. Navarro meets criteria for PTSD. This evaluator opines within a reasonable degree of psychiatric certainty that Mr. Navarro's disability of PTSD was pre-existing to the subject incident. Records support that he was previously diagnosed by medical doctors months before the incident, and Mr. Navarro admitted to recognizing impairing symptoms in 2020 and seeking out treatment at that time.

The majority of Mr. Navarro's symptoms can be attributed to his pre-existing diagnoses. Specifically, as noted above, non-incident factors would include his childhood traumas as well as experiences while

working in the Philippines. Indeed, his symptoms were so pronounced that they interfered with his occupational functioning, prompting a medical leave from work months before the incident. While Mr. Navarro reported that with treatment, his symptoms were abating, that does not suggest that he was in remission.

Thank you for this testing opportunity. Please do not hesitate to contact me if you should have any questions or concerns.

Rachyll Dempsey, Psy.D., QME, ABPP
Forensic Neuropsychologist
Clinical Psychologist PSY21261
Qualified Medical Evaluator
Board Certified Forensic Psychologist

**Qualifications**

Dr. Dempsey is a Forensic Neuropsychologist licensed as a psychologist in 2006 by the California Board of Psychology; as a psychologist in 2022 by the Nevada and Alaska Boards of Psychology; and joined PsyPact with Temporary Authorization to Practice (TAP) in 2024. Further, she is Board Certified as a Forensic Psychologist through the American Board of Professional Psychology (ABPP) in 2017; became a Qualified Medical Evaluator certified by the Worker's Compensation Appeals Board (WCAB) in 2014; certified as an Independent Practitioner by the California Sex Offender Management Board (CASOMB) in 2012; and was President of the Northern California Neuropsychology Forum (NCNF) 2015-16 and Chapter Chair of California Coalition on Sex Offending (CCOSO) 2016-17. She spent six years as a licensed psychologist working as Assessment Coordinator and supervisor for trainees at San Quentin State Prison and is currently CEO and Founder of Psychological Assessment, Inc., a corporation providing psychological testing and assessment in forensic and non-forensic domains, competency restoration program, sex offender treatment, and corporate services. In her career, she has conducted thousands of various psychological assessments and interviews, testified or been deposed in dozens of cases (both criminal and civil) as an expert witness, taught assessment and forensic psychology at several universities, worked as a consultant for attorneys and psychologists, and has supervised psychology trainees. Dr. Dempsey has been qualified as an expert in civil, criminal, probate, and dependency courts including, but not limited to: forensic psychologist, neuropsychologist, correctional specialist, sex offender specialist, competency expert, expert on elder competency, and developmental specialist in court.

# EXHIBIT B

PSYCHOLOGICAL ASSESSMENT, INC.

**R. Dempsey, PsyD, QME, ABPP**
Forensic Neuropsychologist * PSY21261
Board Certified Forensic Psychologist

**Rebuttal Report**

2 July 2024

Re: Anthony Navarro
DOB: 11/17/80
Case: 3:23-cv-02402-SK

Dear Ms. Li,

You retained me to review and offer opinions regarding Natalie Jones, PsyD, LPCC's report of Anthony Navarro dated 6/6/24 and addendum issued 6/28/24. Below please find my impressions.

***Evaluator***
Dr. Jones is licensed as a Licensed Professional Clinical Counselor (LPCC) and is not a licensed psychologist. The LPCC allows individuals without a graduate degree (requiring only the completion of 60 semester hours of graduate coursework that covers LPCC requirements and includes a focus on counseling) to obtain a license to practice. While she does indicate that she has a doctorate of psychology, it is unclear why Dr. Jones has not pursued licensure as a psychologist. Note, while in this case Dr. Jones does not appear to be practicing outside of the scope of her license, the LPCC is limited.

***Background***
Mr. Navarro is reported to be residing in Da Nang, Vietnam with his wife and child. In Dr. Jones' report he is quoted as admitting to witnessing domestic violence through his childhood. Her report reflects that Mr. Navarro is highly educated, having obtained a master's degree in education in 2012. It also indicates that at the time of the assessment he had been working part time for a year and a half developing non-profit curriculums and as a DJ. She indicates that prior to his relocation out of the country, he was employed full-time as an Ethnic Studies teacher. Missing from the report is a full developmental history (including birth/developmental milestones, abuse history, school behavioral history, etc.), his reasons for emigrating, and his full employment history (including length of employment, terminations, performance, etc.)

Dr. Jones outlines a mental health history for Mr. Navarro including treatment for symptoms of anxiety and "panic attacks." However, no description of the symptoms of panic attacks was provided. She outlines that he was diagnosed with Post Traumatic Stress Disorder (PTSD) at Kaiser Hospital in March 2022, prior to his arrest in June 2022, though admitted that records were not available to outline the criteria that Kaiser clinicians used to diagnose PTSD. She further indicates that Mr. Navarro had a history of suicidal ideation as found in records, but no exploration of attempts/

With regard to medical history, Dr. Jones only includes a discussion of scrapes and bruises incurred during the June 2022 arrest. Missing from the report is a full medical history including previous injuries, head injuries/losses of consciousness, surgeries, etc. Further, Dr. Jones alludes to Mr.

Navarro having a substance abuse problem, but writes that it was not "relevant to his diagnosis of PTSD."

***Testing Measures/Procedures***
As noted above, the LPCC is limited and as such testing is limited. Dr. Jones opted for Detailed Assessment of Posttraumatic Stress (DAPS), Clinician Administered PTSD scale for DSM-5 (CAPS5), Beck Depression Index, 2nd ed. (BDI-II), and Beck Anxiety Inventory (BAI). These are tools that an LPCC may utilize and are usually utilized in basic assessment for treatment baseline and outcome purposes. Specifically, the CAPS-5 is an interview, and the BAI and BDI-II are self-report measures, all lack validity scales. Indeed, a discussion of test validity appears to be missing from the report.

***Test Interpretations***
Dr. Jones does a good job of listing scores found on self-report measures and justifying scores given in the CAPS5 interview measure. However, she arrives at conclusions that may be short-sighted and could be evidence of confirmation bias.

For example, she indicates that because Mr. Navarro's T-score of 46 on a scale that assesses for substance abuse (wherein he put a "1" for all questions related to drug use) that it "indicates that he does not have challenges with substance abuse." While this could be true, it could also mean that he simply denied any problems with substance abuse for a report that was going to be used for compensation seeking. The same is true with a suicidality scale in which Mr. Navarro's T-score was 47. Dr. Jones writes "This indicates that he does not have any thoughts or behaviors associated with suicide." While this could be true in the moment he took the test, it is in contrast with her note in the Mental Health section where she quotes Kaiser records as indicating that Mr. Navarro admitted suicidal ideation to his physician which resulted in being taken off work.

In the same way, Dr. Jones lists elevated scores across all trauma and symptom domains of all the scales where Mr. Navarro identified his recent arrest as being the most traumatic.

***Diagnosis/Discussion***
Dr. Jones diagnosed Posttraumatic Stress Disorder and Generalized Anxiety Disorder (GAD) (by history). However, nowhere in her report did it indicate when and where he was diagnosed with GAD. In her discussion section, Dr. Jones reiterates test scores and emphasizes that anxiety and depression are comorbid with a diagnosis of PTSD. She does not reconcile how Mr. Navarro would then also qualify for GAD.

***Discussion***
Many relevant details appear to be missing from this report which would assist any credible evaluator in diagnosing PTSD and/or apportioning exacerbation of symptoms if relevant. Specifically, medical history, substance abuse history, developmental history, and legal history help for differential diagnosis. For example, medical conditions could result in mental health symptoms including paranoia and "panic attacks" (i.e. thyroid conditions). Substance abuse (i.e. methamphetamine,

cannabis, etc.) can result in paranoia. Legal history (including incarceration experience) could lend to the development of many mental health issues including paranoia and withdrawal.

Dr. Jones includes many details such as Mr. Navarro was fearful of "white guys" but does not specifically outline that the only reason that Mr. Navarro would have this problem was due to the arrest. Indeed, she indicates that Mr. Navarro had problems with gang activity early on and it is possible that this is where he developed his fear of "white guys." Further, Dr. Jones includes that Mr. Navarro was involved in a motorcycle accident a week before her assessment, but this information was included in the DAPS testing discussion and did not appear to include any follow-up with regard to head injury or other injury that might affect the testing. Instead, she includes Mr. Navarro's conclusion that he was distracted due to his case.

Overall, while many elements are included in Dr Jones' report to support a diagnosis of PTSD, in forensic reports it is imperative to include all information that could be relevant for where the diagnosis came from and what percentage was due to possible exacerbation if a diagnosis was pre-existing.

***Recommendations***

- It is recommended that Mr. Navarro undergo a full assessment by a licensed psychologist who can include a more thorough discussion of Mr. Navarro's background; include more objective testing that is not solely focused on symptoms and predominantly PTSD; and can explore apportionment should a diagnosis of PTSD

Thank you for the opportunity to review this report. Please do not hesitate to contact me if you should have any questions or concerns.

Rachyll Dempsey, Psy.D., QME, ABPP
Forensic Neuropsychologist
Clinical Psychologist PSY21261
Qualified Medical Evaluator
Board Certified Forensic Psychologist

**Qualifications**

Dr. Dempsey is a Forensic Neuropsychologist licensed as a psychologist in 2006 by the California Board of Psychology; as a psychologist in 2022 by the Nevada and Alaska Boards of Psychology; Board Certified as a Forensic Psychologist through the American Board of Professional Psychology (ABPP) in 2017; became a Qualified Medical Evaluator certified by the Worker's Compensation Appeals Board (WCAB) in 2014; certified as an Independent Practitioner by the California Sex Offender Management Board (CASOMB) in 2012; and was President of the Northern California Neuropsychology Forum (NCNF) 2015-16 and Chapter Chair of California Coalition on Sex Offending (CCOSO) 2016-17. She spent six years as a licensed psychologist working as Assessment Coordinator and supervisor for trainees at San Quentin State Prison and is currently CEO and Founder of Psychological Assessment, Inc., a corporation providing psychological testing and

assessment in forensic and non-forensic domains, competency restoration program, sex offender treatment, and corporate services. In her career, she has conducted thousands of various psychological assessments and interviews, testified or been deposed in dozens of cases (both criminal and civil) as an expert witness, taught assessment and forensic psychology at several universities, worked as a consultant for attorneys and psychologists, and has supervised psychology trainees. Dr. Dempsey has been qualified as an expert in civil, criminal, probate, and dependency courts including, but not limited to: forensic psychologist, neuropsychologist, correctional specialist, sex offender specialist, competency expert, expert on elder competency, malingering, and developmental specialist in court.

# EXHIBIT C

Lifetime Counseling and Consulting
Dr. Natalie Jones, PsyD, LPCC
www.drnataliejones.com
Email: admin@drnataliejones.com
Phone: (510) 698-2469
PO Box 2614
Fair Oaks, CA 95628

**Date of Report:** Thursday, June 6, 2024

**Defendant:** Anthony Navarro

**Date of Birth and Age:** 11/17/1980, 43

**County:** San Francisco County

**Evaluator:** Dr. Natalie Jones, PsyD, LPCC

**Clinical Opinion:** Mr. Navarro meets the diagnostic criteria for posttraumatic stress disorder. Mr. Navarro's symptoms of posttraumatic stress were exacerbated by his arrest with use of force incident on 6/16/2022.

**Evaluation Procedures:**

Mr. Navarro was interviewed and evaluated for a period of approximately 4 hours via Zoom on 5/23/24 from 5pm to 9pm Pacific Standard time. This writer conducted a clinical interview and administered the Detailed Assessment of Posttraumatic Stress (DAPS), the Clinician Administered PTSD scale for DSM-5 (CAPS5) – Past Month/Worst Month, Beck Depression Inventory II (BDI-2), and the Beck Anxiety Inventory.

**Reason for Referral:**

Instructions were received from Mr. Patrick Buelna, Esq., partner of The Lawyers for the People firm to conduct an evaluation of Mr. Anthony Navarro to determine the exacerbation of his posttraumatic stress disorder (PTSD) from his arrest which involved use of force on June 16, 2022, by the San Francisco Police Department.

**Informed Consent:**

Mr. Navarro was informed of this writer's role as a licensed professional clinical counselor to evaluate him to determine the exacerbation of his PTSD symptoms from his arrest on June 16, 2022. Mr. Navarro was informed of the limits of confidentiality and was advised that this writer was also a mandated reporter as per California Board of Behavioral Sciences. This was explained to him using simple language. Mr. Navarro was advised that anything that was discussed during the evaluation was not confidential and would be made available to the court and to his attorney, and that this writer may be questioned about anything that was said during the evaluation as well as what is written in the report. Mr. Navarro verbalized understanding and was able to reiterate the limits of confidentiality and mandated reporting policies and was given the opportunity to ask questions.

**Data Sources Reviewed:**

This writer reviewed the following for the purposes of this report:

- Anthony Navarro's deposition transcript
- Body camera footage dated 6/17/22 of the following officers – Faubel, Andrakin, Byrd, Cubas, Girvin, Horton, Li, Lubey, St. Clair, and Sheehan
- Police Incident Reports dated 6/16/22 for Officers Lubey and Horton
- Use of Force Log for Incident on 6/16/22
- Kaiser San Francisco Medical Records

**Personal/Family:**

Mr. Navarro is married, and currently resides in Da Nang, Vietnam with his wife and his infant son. He has lived in Da Nang since July 2022. Mr. Navarro was born and raised in San Diego, California and lived with his parents who were married, his 2 sisters, and his brother until he was 18 years old. After a domestic violence incident in 1999, where his father allegedly assaulted and threatened his mother's life; Mr. Navarro's mother, siblings, and he relocated to the San Franciso area to seek safety. Mr. Navarro reported that his father was frequently incarcerated due to domestic violence towards his mother during his childhood.
Apart from his father, Mr. Navarro's family of origin still resides in the San Francisco area. It is unclear where Mr. Navarro's father resides, as he reported that they have been estranged for several years. He described his relationship with his mother as "nurturing and loving" and reported that they talk on the phone several times per week. His relationship with his siblings was described as "positive."

**Social:**

Mr. Navarro described his mother, wife, and his sister as being the people whom he is closest to and communicates with on a consistent basis. He reported that most of his friends reside in the San Francisco area, and he communicates with them on occasion. He reported that his "social circle small is now."

**Educational/Occupational:**

Mr. Navarro attended University City High School in San Diego and graduated when he was 17. He then attended San Francisco City College where he obtained his general education credits and his teaching credential. Mr. Navarro received a Bachelor of Arts in ethnic studies from San Francisco State University and graduated with a 3.8 GPA in 2010. He received a Master of Arts in Education from the University of San Francisco in 2012.

Per his self-report, for the past 1.5 years, Mr. Navarro has worked about 15-20 hours a week developing non-profit curriculums and as a DJ. Previously, he was employed as a full-time Ethnic Studies teacher and a student mentor at Balboa High School in San Francisco.

**Mental Health:**

Per his self-report, Mr. Navarro sought treatment from an unlicensed therapist for somatic therapy from December 2021 until May or June 2022 twice per month for anxiety and panic attacks. He

stopped attending treatment with her when he could no longer afford the therapy sessions. He reported that he saw this therapist twice per month.

Per the notes from Kaiser San Francisco, Mr. Navarro spoke to the advice nurse on 3/7/22 (see Kaiser San Francisco records pages 104-105) stating that he was having anxiety and panic attacks, and he was scheduled for a follow-up with the medical doctor. Subsequently, Mr. Navarro's medical doctor diagnosed him with PTSD on 3/8/22 (see Kaiser San Francisco medical records pgs. 106-107) after he "broke down" during a "mental health discussion at school." During the visit that Mr. Navarro had with his physician he reported suicidal ideation. Due to Mr. Navarro not being able to return to work due to his mental distress, his doctor gave him a note to excuse him from work for 2 weeks (See Kaiser San Francisco notes, dated 3/8/22, page 110). His physician later extended his leave from work until 4/24/22 while Mr. Navarro was being evaluated by the Kaiser psychiatric department (see Kaiser San Francisco Medical Records p. 129, date 4/11/22). It's unclear what assessment measures if any Mr. Navarro was given to be diagnosed with PTSD, as this writer did not have Kaiser psychiatry records.

Mr. Navarro did offer further information on what prompted him to become overwhelmed with distress and anxiety on 3/8/22 during the interview with this writer on 5/23/24. He reported that several of the students that he had mentored while living in the Philippines died by suicide. He recalled that the discussions at school around mental health awareness and suicide triggered him to think about the students that he lost, triggering him to feel anxious and suicidal. Mr. Navarro did have an evaluation for therapy services for which he attended one session on 4/7/22 (see Kaiser San Francisco medical records p.128, date 4/11/22), and attended trauma recovery groups at Kaiser. The outcome of the psychiatric evaluation and the trauma recovery groups for Mr. Navarro are unclear, as those records were not available through Kaiser, although it does appear that he was evaluated by a psychologist.

After the arrest with use of force incident, Mr. Navarro was evaluated by a physician at Kaiser and subsequently referred to mental health by his primary care physician (see Kaiser San Francisco Medical Records, dated 6/24/22, pg. 56). On 7/1/22, Mr. Navarro saw a clinician (see Kaiser San Francisco records, pg. 61) and discussed being referred to individual therapy. A social worker from Kaiser San Francisco attempted to follow-up with Mr. Navarro on 7/18/22 about individual therapy, however he reported he was in Vietnam and did not show up for his appointment (see Kaiser San Francisco medical records, dated 7/18/22, pgs. 62-65).

Mr. Navarro reported that he continues to experience symptoms of anxiety, and occasional panic attacks when discussions about his case arise or when he must come to court. He indicated that he doesn't "feel safe in crowds," "around the police," "around big White guys," or "in the US" since his arrest incident and avoids potential encounters.

**Medical:**

Mr. Navarro reported having some scrapes and bruising with respect to his arrest on 6/16/22. The police photo from the police reports (p. 10, dated 6/17/22) show that Mr. Navarro was scraped and bleeding. Kaiser San Francisco records (p. 152, dated 6/17/22) and photos (p. 153-155, 6/17/22) indicated that Mr. Navarro had suffered scrapes on left side of his forehead (above eyebrow), swollen top lip, swollen nose with bruising, general body/neck pain, and bilateral shoulder and knee

pain (with scrapes). He was treated by the physician at Kaiser and released (Kaiser San Francisco records, dated 6/17/22, p.152). Mr. Navarro reported that he is no longer experiencing any diagnosed medical issues from the alleged incident as of the date of this report.

**Substance Abuse:**

Mr. Navarro did not endorse any current substance abuse relevant to his diagnosis of PTSD.

**Mental Status Exam**

On 5/23/24, Mr. Navarro presented on time via Zoom. The assessment was conducted confidentially. He was appropriately dressed and appeared to be his stated age. He was alert and oriented x 5 (person, time, place, situation, and object). Upon first arrival, he was pleasant although he stated that he felt "nervous." His affect was calm. Mr. Navarro was forthcoming with information, and times had to be redirected due to him being forthcoming. This writer and Mr. Navarro were able to build a rapport quickly.

Speech was within normal limits. His thought process was organized and goal-directed. He denied homicidal or suicidal ideation/plan/intent/means/desire. He denied audio/visual/olfactory/tactile hallucinations. He was attentive and focused during the discussion and the assessment process. Good insight demonstrated by his ability to discuss his challenges with his mental health and interventions available to him.

**Assessments**

Mr. Navarro was administered the DAPS, which is a self-report measure with 104 items that assesses peritraumatic symptoms (which are experienced during and after the trauma); and posttraumatic symptoms (factors that are related to an increased risk of PTSD) as it relates to a specific traumatic incident. The DAPS assesses both current and lifetime exposure of trauma. With respect to PSTD diagnostic criteria, the DAPS evaluates the PTSD cluster symptoms: 1) re-experiencing (how much does a person feel like they are re-experiencing the trauma), 2) avoidance (how much effort does a person make to avoid reliving/thinking about the trauma) and 3) hyperarousal (how much does the traumatic experience cause the person to feel jumpy, startled, or on edge). The DAPS took an hour to administer.

Mr. Navarro was administered the CAPS5 – Past Month/Worst Month version, which is a 30-item structured interview which can be used to make a current or lifetime diagnosis of PTSD and assess PTSD symptoms in the past month. This assessment reviewed the trauma symptoms (arrest with use of force) during the worst month since the experience, and the past month. The assessment evaluates the symptoms of PTSD experienced, reviews the onset and duration of the symptoms, subjective distress, impact on social and occupational functioning, the severity of symptoms, and the specifications for the dissociative type of PTSD (depersonalization and derealization). The severity rating is based on symptom intensity and frequency. The CAPS5 took 1 hour 45 min to administer.

Mr. Navarro was administered the BDI-2, which is a subjective 21 item self-report measure that assesses the severity and intensity of each symptom of depression over the past 2 weeks. Each item is a list of 4 statements listed in order of increasing severity as it relates to symptoms in

depression. The items are rated on a scale of 0-3, with 0 indicating that the person is not experiencing any symptom distress, 1 indicates that the person is experiencing mild distress from the symptom, 2 meaning that the person is experiencing moderate distress from the symptom, and 3 being indicative that the person is feeling severe distress from the symptom. Each symptom rating/score is then added together for a final sum of all symptoms to determine the severity of depression. Based on the sum of symptoms, the following scores indicate: 1-10 life's normal ups and downs, 11-16 mild mood disturbance, 17-20 borderline clinical depression, 21-30 moderate depression, 31-40 severe depression, and over 40 is extreme depression. The BDI-2 took 5 minutes to administer.

Mr. Navarro was administered the BAI, which is a subjective 21 item self-report measure that assesses the emotional, physical, and cognitive symptoms associated with anxiety over the past month. The assessment lists the symptoms of anxiety which are to be rated on a scale of 0-3, which is based on the level of distress each symptom is causing. A rating of 0 indicates that the person is not affected by the symptom, a 1 indicates that the person is mildly affected by the symptom, a 2 indicates that the person is moderately affected by the symptom, and a rating of 3 indicates that the person is experiencing severe distress from the symptom. Each symptom rating/score is then added together for a final sum of all symptoms. Based on the sum of symptoms, the following scores indicate: 0-21 low anxiety, 22-35 moderate anxiety, 36 and above are severe levels of anxiety. The BAI took 5 minutes to administer.

Mr. Navarro completed a clinical interview with this writer to gather his biopsychosocial information and historical information as it relates to the assessment of PTSD symptoms.

**Psychometric Findings:**

*DAPS*

On the DAPS, Mr. Navarro was initially asked about traumatic events he had experienced in his lifetime. Mr. Navarro reported that he had witnessed domestic violence between his parents, witnessed gang activity, was involved in a motorcycle accident approximately a week ago, had been mugged, and was arrested with use of force on 6/16/22. Mr. Navarro indicated that his arrest with use of force on 6/16/22 was the most traumatic and this incident was identified as the *index trauma* (trauma that is most upsetting or clinically important at this time). One *pretrauma factor* which indicates a person has a higher risk of developing PTSD is prior trauma exposure. The number of traumas that Mr. Navarro endorsed was higher than what most people who experienced trauma report (T-score = 70), which is clinically significant. (Most people who have been exposed to one traumatic stressor have a T-score of 50 and are asymptomatic). Mr. Navarro reported that he believed his recent motorcycle accident was caused by excessive thinking and worry about his case.

*Peritraumatic distress*, which is the number of negative emotions and thoughts experienced during or soon after the trauma, was assessed with respect to arrest involving use of force. There was a total of 7 items which asked about symptoms experienced during or around the time of the arrest with use of force which had the following rating scale: 1 = none, 2 = a little, 3 = some, 4= quite a bit, and 5=very much. Mr. Navarro's scores indicated that he experienced more negative emotions than the average person who experiences trauma (T=82). He endorsed feelings of fear, helplessness,

horror, shame or humiliation, upset, and having thoughts that he might die as being at 5 (very much).

*Peritraumatic dissociation* was assessed and is defined as being "the alteration in awareness, especially those involving depersonalization (a state in which your thoughts and feelings don't seem real, or feeling like your thoughts don't belong to you) and derealization (feeling detached from your surroundings; people and objects around you don't seem real) which occur during a traumatic event." Symptoms of peritraumatic dissociation around Mr. Navarro's arrest involving use of force were 5 items, which were rated on the following rating scale: 1 = none, 2 = a little, 3 = some, 4= quite a bit, and 5=very much. Mr. Navarro had a T-score of 75 and rated the following as a 5 (very much): things around him felt unreal or strange and wasn't completely aware of what was going on around him. He indicated a 4 (quite a bit) on the following items: mind went blank, time seemed to slow down or speed up. Mr. Navarro has a T score of 75, which is indicative of significant feelings of distress during the traumatic event, and he is likely to report symptoms of PTSD.

*Posttraumatic Stress Scales* – Evaluate the extent to which Mr. Navarro is experiencing the 3-cluster symptoms common in PTSD (re-experiencing, hyperarousal, avoidance) and the impact that these symptoms are having on his mental health.

*Re-experiencing*, which is having intrusive thoughts about the trauma such as flashbacks, memories, dreams or nightmares about the traumatic event, and psychological distress, as well as autonomic reactivity upon exposure to the traumatic event was also assessed over 10 items. Items were rated as follows: 1 = never, 2 = less than once a week, 3 = about once a week, 4 = 2 or 3 times a week, and 5 = 4 or more times a week. Mr. Navarro rated the following as a 5 (4 or more times a week): upsetting thoughts or memories of the experience pop into his mind, getting upset or nervous when something or someone reminds you of what happened, thoughts or images of what happened that he couldn't get out of his mind, feeling frightened or upset when something reminded him of the experience, and memories of the experience seemed to come out of nowhere. He rated the following item as a 4 (2 or 3 times a week): a memory of the experience that was so strong or intense that he felt like it was happening all over again. Mr. Navarro's T-score on the re-experiencing scale is 101, which is indicative that he is consistently experiencing intrusive thoughts of the traumatic experience and is unable to control them.

*Avoidance* is the act of avoiding people, places, conversations, or situations that trigger flashbacks or re-experiencing of symptoms, emotional numbing, and constriction. Two types of avoidance were assessed: 1) *effortful avoidance*, which is not wanting to talk about the traumatic experience and avoidance of people, places, and situations that trigger traumatic memories, and 2) *numbing avoidance,* which is emotional constriction and numbing associated with loss of interest in activities and feeling disconnected from others. Avoidance was assessed over 10 items using the following rating scale: 1 = never, 2 = less than once a week, 3 = about once a week, 4 = 2 or 3 times a week, and 5 = 4 or more times a week. He scored a 5 (4 or more times a week) on the following items: not wanting to discuss what happened, feeling less connected to people than before the incident happened, staying away from people or places that reminded you of what happened, trying not to have upsetting thoughts or feelings about what happened, not being able to feel your feelings as much as you did before the experience, and not doing certain things because the reminded you of the experience. He rated the following items a 4 (2 or 3 times a week): losing interest in doing

things since the experience, and not being able to feel your emotions as much since it happened. Mr. Navarro's overall avoidance score was T=112, and he had an effortful avoidance score of T= 122 and his numbing avoidance was T=107. His scores are indicative of experiencing significant avoidance symptoms including withdrawal, emotional numbing, lack of interest, and tendency to avoid people, places, and situations associated with the arrest.

*Hyperarousal*, which is sustained hyperactivation of the sympathetic (fight/flight) nervous system and includes startle responses, tension, sleeping difficulties, irritability, problems with attention and concentration, and hypervigilance. There were 10 items on the DAPS that assessed symptoms of hyperarousal using the following rating scale: 1 = never, 2 = less than once a week, 3 = about once a week, 4 = 2 or 3 times a week, and 5 = 4 or more times a week. With respect to the incident of the arrest involving use of force, Mr. Navarro scored the following items a 5 (4 or more times a week): since it happened, your mind wandering even though you needed to concentrate; people irritating you more than they did before the experience; feeling jumpy or on edge since it happened; looking out for danger since it happened; and since it happened, and being startled or frightened by sudden noises or movements. He scored the following items at a 4 (2 or 3 times a week): problems concentrating or paying attention since it happened; since the experience, flinching when there was a loud noise or something moved close to your face or body; and since the experience, having times when you were so alert that you couldn't relax. Mr. Navarro's T score on the hyperarousal scale is 100 and is indicative that he tends to feel on edge or jumpy, has problems concentrating or staying focused, tension, irritability, and may complain of somatic concerns (e.g. muscle tension, gastrointestinal issues).

*Posttraumatic Stress-Total* is the sum of the re-experiencing, avoidance, and hyperarousal scores, which express the overall severity of PTSD symptoms expressed by Mr. Navarro. For context, a posttraumatic stress total score where T is greater than or equal to 65 is in the moderate to severe range and is indicative that someone is experiencing significant distress from PTSD symptoms. In Mr. Navarro's case, his scores were elevated on re-experiencing, hyperarousal, and the avoidance items. Mr. Navarro had a posttraumatic stress T score of 107, which indicates that his posttraumatic stress symptoms are in the severe range.

*Posttraumatic Impairment* – This scale evaluated Mr. Navarro's subjective level of impairment because of the effects of the traumatic event (arrest with the use of force). Essentially, this scale is evaluating how Mr. Navarro believes the traumatic event affected his level of social, emotional, and occupational functioning. There were 5 items on the DAPS, which assessed posttraumatic impairment using the following rating scale: 1 = never, 2 = less than once a week, 3 = about once a week, 4 = 2 or 3 times a week, and 5 = 4 or more times a week. Mr. Navarro rated the following items a 5 (4 or more times a week): because of what happened to you, not being able to do things as well as you used to; problems in your relationships with others because of what happened to you; having trouble at work, school, or in social situations because of what happened to you; more problems in your life since this happened. He rated the following item a 4 (2 or 3 times a week): not being able to do things you needed to do because of the stress that happened to you. Mr. Navarro's T-score is 108, which indicates that he believes that the traumatic event has compromised his quality of life and that he has trouble functioning at work, in social situations, in his relationships, and in other aspects of his life.

Overall, based on his scores on the DAPS, Mr. Navarro's experience of being arrested with use of force does meet the criteria for PTSD due to his symptoms and posttraumatic stress level being in the severe range.

*Associated features*, which are symptoms that are frequently found to be comorbid with PTSD were also assessed. Those include trauma-specific dissociation, substance abuse, and suicidality.

The *trauma-specific dissociation* scale evaluates lasting responses to trauma including derealization (feeling detached from your surroundings), depersonalization (feeling separated from your body), and detachment symptoms that can persist after experiencing trauma. There were 4 items assessed using the following rating scale: 1 = never, 2 = less than once a week, 3 = about once a week, 4 = 2 or 3 times a week, and 5 = 4 or more times a week. Mr. Navarro scored a 5 (4 or more times a week) on the following items: since the experience, feeling like you were walking around in a dream or a movie; and since it happened, things not feeling completely real. His T-score on this scale is a 93, indicating that he continues to have dissociative symptoms which persist.

The *substance abuse* scale measured Mr. Navarro's self-reported use of drugs and alcohol. People with PTSD may use substances to try and cope with distressing thoughts and feelings. There were 10-items administered on substance abuse which used the following rating scale: 1 = never, 2 = once or twice, 3 = sometimes, 4 = often, and 5 = very often. Mr. Navarro's T-score on the substance abuse scale is 46, and he scored a 1 on all scales, therefore denying any abuse of substances. This indicates that he does not have challenges with substance abuse.

The *suicidality* scale measures suicidal ideation, motives, and behaviors. People who suffer from PTSD may struggle with depression and suicidal symptoms. The DAPS had 10 items that assessed for suicidality using the following rating scale: 1 = never, 2 = once or twice, 3 = sometimes, 4 = often, and 5 = very often. Mr. Navarro's T-score on the suicidality scale is 47, and he scored a 1 on all scales. This indicates that he does not have any thoughts or behaviors associated with suicide.

*CAPS5*

The assessment began with evaluating Criterion A, which determined whether Mr. Navarro's experience qualified as a traumatic experience. Since Mr. Navarro had already completed the DAPS prior to the CAPS5, it was determined that the police incident involving use of force qualified as a traumatic event. Mr. Navarro was further queried about his experience since the trauma over the past month and the worst month since the experience occurred.

*Criterion B: Intrusion Symptoms-*

Intrusion symptoms are recurrent, involuntary, and intrusive distressing memories, flashbacks, dreams, or re-experiencing associated with the traumatic event. For the worst month, Mr. Navarro indicated that he was having intrusive thoughts on a daily basis, which caused him to feel paranoid, have dreams where "White dudes were violent and attacking me," to zone out when having flashbacks, get upset with reminders about the court case, experienced sweating, shaking, feeling tense when something reminded him of the case. Mr. Navarro indicated that his triggers which caused intrusive symptoms included anything involving his court case, social media, law enforcement, any news about police brutality, any discussions about the case. His responses suggested that during the worst month, the traumatic event had a severe/extreme impact on him,

which means that the symptoms were overwhelming, and he had difficulty managing them. He reported that at times, it would take him 30-45 minutes to calm down or to try and put these intrusive thoughts out of his mind. He reported that he thought that these intrusive dreams, flashbacks, memories, and feelings were caused by the arrest.

For the past month, Mr. Navarro reported feeling the same symptoms as he did in the worst month, however, he endorsed these items as having a moderate/mild impact on his ability to function. He reported experiencing these symptoms anywhere from 2-3 times per week to twice per month.

*Criterion C: Avoidance Symptoms-*

The avoidance symptoms are attempts to avoid stimuli associated with the traumatic event, including memories, thoughts, people, places, conversations, activities, objects, and feelings associated with the event.

Mr. Navarro reported that he actively avoided having thoughts or feelings about his arrest involving use of force. He stated that he tried to "avoid feeling depressed, ashamed, thoughts of hopelessness, and anger" by "meditating and staying present in the moment." For the worst month, he indicated that his symptoms were severe "at least 3 times per week" and during the past month, his symptoms were moderate and occurred about "3 times per month."

Mr. Navarro reported that he tried to avoid things that remind him of the event, such as "big white dudes acting machismo and aggressive, and drunk people." He reported making a "conscious effort. I don't go to these situations." During the worst month, his symptoms were extreme, and occurred everyday. During the past month, he reported that he had these feelings about "5 times per month," which meant that his symptoms were moderate.

*Criterion D: Cognitions and Mood Symptoms-*

This item assesses: the inability to remember aspects of the traumatic event; persistent and exaggerated negative beliefs, or expectations about oneself, others, or the world; persistent, distorted cognitions about the cause or consequences of the traumatic events that cause the individual to blame themselves or others; feelings of detachment; persistent inability to experience positive emotions; and diminished interest or participation in activities.

In the worst month, Mr. Navarro reported that he did not trust big White guys, police officers, feels paranoid around people who record on their phones, isn't able to focus on work, doesn't really enjoy playing basketball or being social, and it was hard for him to be happy. Mr. Navarro reported that these symptoms occurred daily or almost daily. Thus, these symptoms had a severe impact on his level of functioning and were at times overwhelming and very difficult for him to manage. Mr. Navarro reported that he did not have any trouble remembering important aspects of the event.

In the past month, Mr. Navarro endorsed having the same challenges as he did in the worst month, but to a lesser frequency and intensity. He believed that the symptoms were caused by the arrest with use of force and endorsed the impact as being mild-moderate. He reported that while he does continue to have challenges, they are not as overwhelming and frequent as they were in the worst month.

*Criterion E: Arousal and Reactivity Symptoms-*

This item assessed: irritable behavior; angry outbursts expressed as verbal or physical aggression; reckless or self-destructive behavior; hypervigilance; exaggerated startle response; problems with concentration; and sleep disturbances.

During the worst month, Mr. Navarro reported experiencing symptoms several times per day. He reported: feeling irritable; being short with people; having a lack of patience; unwelcoming body language; defensiveness; cautiousness; feeling on guard; looking around; not being present; feeling paranoid; being mindful of surroundings; not wanting to be touched on his arms; paranoid about people recording him; being triggered by paramilitary; big White guys; would frequently zone out in conversations and on tasks; and had some challenges with not getting enough sleep due to feeling a lot of anxiety around court. Mr. Navarro endorsed these items as having a moderate to extreme impact on his level of functioning during the worst month. He described feeling overwhelmed and as though the symptoms were unmanageable.

During the past month, he endorsed having the same symptoms and challenges as he did in the worst month, but to a lesser frequency and intensity. Mr. Navarro endorsed these items as having a mild to severe impact on his level of functioning. While these symptoms are challenging and do overwhelm him at times, he has been able to manage them with a lot of effort.

Mr. Navarro reported that his symptoms of PTSD have lasted 2 years and are still ongoing.

*Distress or Impairment:*

Mr. Navarro indicated that had extreme challenges in his social, occupational, and other areas of functioning everyday during the worst month since the incident. Mr. Navarro reported "I had to leave the country. I couldn't live here anymore. I didn't want to see the police. I couldn't be around anybody. I distanced myself from my friends. I quit my job."

During the past month, the challenges with his social, occupational, and other areas of functioning appear to be moderate as Mr. Navarro indicated "I keep my circle small. I just really talk to my wife, my mom, and my sister. I haven't been able to work a whole lot. I want to find a full-time job. It's been difficult for me to concentrate. I don't go to places where there is a crowd or a lot of police."

*Diagnosis:*

Mr. Navarro meets the criteria for PTSD diagnosis. His scores on both the worst month (59) and the past month (34) are higher than the cutoff score of 23. Diagnostically, he has met the requirements for each category of PTSD symptoms on the CAPS5.

*Dissociative symptoms:*

Depersonalization is having persistent or recurring experiences of feeling detached from, and as if one is an outside observer of one's mental processes or body. Derealization is persistent or recurrent experiences of unreality and surroundings.

In the worst month, Mr. Navarro denied experiencing derealization and depersonalization.

During the past month, Mr. Navarro has denied having any symptoms of depersonalization or derealization.

*BDI-2*

On the BDI-2, Mr. Navarro scored a raw score of 35, which is indicative of symptoms of severe depression. While he denied having thoughts of suicide, both on the assessment and in the interview, he did endorse several items, which indicate that he has a negative view of himself (loss of interest, self-criticism, self-deprecating), thoughts of hopelessness, negative emotions (e.g. feeling irritable, fatigued, guilty, and having a lack of pleasure in things he used to enjoy). Symptoms of hopelessness and anhedonia (lack of pleasure) are indicative of major depressive disorder.

*BAI*

On the BAI, Mr. Navarro scored a raw score of 44, which is indicative of severe anxiety over the past month. Mr. Navarro endorsed having general feelings of fear (e.g. feeling scared, nervous, terrified, unable to relax), specified fears (e.g. fear of dying, losing control), and endorsed a lot of physiological symptoms related to anxiety and panic (e.g. sweating, faint, dizzy, lightheaded).

**Diagnosis**

Posttraumatic Stress Disorder

Generalized Anxiety Disorder (by history)

**Conclusion and Recommendations**

Mr. Navarro does appear to endorse symptoms of PTSD. In addition, he also appears to have significant symptoms of depression and anxiety, which have a high comorbidity rate with PTSD. The assessments administered were the DAPS, CAPS5, BDI-2, and the BAI. All the assessments were based on Mr. Navarro's self-report. The DAPS and the CAPS5 both yielded results supporting a diagnosis of PTSD. The BDI-2 and the BAI were indicative of severe symptoms of depression and anxiety respectively. Symptoms of depression and anxiety are symptoms that are often comorbid with PTSD.

Mr. Navarro was previously diagnosed for PTSD by his primary care physician at Kaiser on 3/8/22 (see Kaiser San Francisco medical records pgs. 106-107) and was advised to take time off until 4/24/22. Mr. Navarro appeared to be managing his symptoms after he attended trauma groups at Kaiser San Francisco, had mental health evaluation with one therapy session, and sought support from the unlicensed therapist that he was seeing (see Kaiser San Francisco records, dated 3/22/2022, pgs.123-130). He was able to return to work and socialize with family and peers. When Mr. Navarro experienced the arrest with use of force, his symptoms of PTSD were exacerbated due to his experience of the trauma of the events that ensued during his arrest.

Mr. Navarro had several pretrauma factors that put him at risk of developing PTSD. The pretrauma factors that increased Mr. Navarro's chances of developing PTSD include prior trauma exposure, history of adverse childhood experiences (domestic violence), prior psychiatric problems (anxiety/depression/PTSD), and an ethnic minority race.

Mr. Navarro had several peritraumatic factors that were related to increased risk of PTSD. Peritraumatic stress is the emotional and physiological distress experienced during or immediately after a traumatic event and is associated with traumatization and severity of posttraumatic stress disorder and related psychological difficulties. Peritraumatic stress is the largest contribution to the development of PTSD. The peritraumatic factors that increased Mr. Navarro's risk of PTSD include: physical trauma; directly experiencing the trauma; feelings of helplessness; unpredictability, and uncontrollability; greater perceived life threat; and greater intensity of the traumatic stressor.

Mr. Navarro had posttrauma factors which lead to an increased risk of developing PTSD, including exposure to other traumas (e.g. experiencing the arrest with use of force after the death of students), and exposure to ongoing stressful life events (e.g. court after the arrest, getting medical treatment, getting medical/mental health assistance).

The DAPS and the CAPS, which were administered to Mr. Navarro, showed elevated distress and trauma symptoms. Both assessments evaluated Mr. Navarro's symptoms that occurred during the time/month that the arrest with the use of force occurred. Both assessments indicated that there was an exacerbation of symptoms after Mr. Navarro's arrest. He experienced several symptoms, including but not limited to inability to work, difficulty concentrating, hypervigilance, re-experiencing the trauma through flashbacks, feeling fearful, withdrawing socially, and avoiding people, places, and situations that reminded him of the event.

Mr. Navarro would greatly benefit from therapy services, and possibly medication management to assist him in managing his symptoms of PTSD, anxiety, and depression. While it has been almost 2 years since the arrest occurred, Mr. Navarro still appears to have symptoms that cause him distress.

If you should have any questions regarding these findings or require additional information, please do not hesitate to contact my office.

I declare under penalty of perjury that the information contained in this report and previous reports that have been forwarded, and their attachments, if any, is true and correct to the best of my knowledge and belief, except as to information that I have indicated that I have received from others, or due to typographical error. As to the information obtained from others, I declare under penalty of perjury that the information referenced herein accurately represents the data provided to the best of my interpretation and, except as noted, that I believe it to be true.

Sincerely,

Dr. Natalie Jones PsyD, LPCC

Dr. Natalie Jones, PsyD, LPCC

Lifetime Counseling and Consulting

## PROOF OF SERVICE

I, ANNAMARIE DAVIS, declare as follows:

I am a citizen of the United States, over the age of eighteen years and not a party to the above-entitled action. I am employed at the City Attorney's Office of San Francisco, Fox Plaza Building, 1390 Market Street, Sixth Floor, San Francisco, CA 94102.

On September 25, 2026, I served the following document(s):

**DECLARATION OF JOSE A. ZELIDON-ZEPEDA SUPPORTING OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 1 TO EXCLUDE DEFENDANTS' EXPERT RACHEL DEMPSEY'S UNDISCLOSED REPORT**

on the following person(s) at the locations specified:

Adante D. Pointer, Esq.
Patrick M. Buelna, Esq.
Lateef H. Gray, Esq.
Pointer & Buelna, LLP
Lawyers for the People
155 Filbert Street, Suite 208
Oakland, CA 94607
*admin@lawyersftp.com*
*apointer@lawyersftp.com*
*pbuelna@lawyersftp.com*
*lgray@lawyersftp.com*
*mmonroe@lawyersftp.com*
*cgalvan@lawyersftp.com*

Attorneys for Plaintiff

(510) 929-5400 (Telephone)

in the manner indicated below:

☒ **BY ELECTRONIC MAIL:** I caused a copy of such document to be transmitted via electronic mail in portable document format ("PDF") Adobe Acrobat from the electronic address: annamarie.davis@sfcityatty.org. I caused the documents to be sent to the person(s) at the electronic service address(es) listed above.

I declare under penalty of perjury pursuant to the laws of the State of California that the foregoing is true and correct.

Executed September 25, 2026, at San Francisco, California.

ANNAMARIE DAVIS